IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| RACHEL KANNADAY, | ) |
| | ) |
| Plaintiff Garnishor, | ) |
| | ) Case No. 12-cv-2742-RDR/KGS |
| vs. | ) |
| | ) |
| CHARLES BALL, Special Administrator | ) |
| of the Estate of Stephanie Hoyt, deceased, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| GEICO Indemnity Insurance Company, | ) |
| | ) |
| Garnishee Defendant. | ) |

## PLAINTIFF GARNISHOR RACHEL KANNADAY'S RESPONSE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT FILED BY GARNISHEE DEFENDANT GEICO INDEMNITY INSURANCE COMPANY

COMES NOW the garnishor plaintiff, Rachel Kannaday, hereinafter "plaintiff" and

offers the following response to the motion for summary judgment filed by garnishee defendant,

GEICO Indemnity Insurance Company, hereinafter "GEICO", and its memorandum in support

of its motion for summary judgment:

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1538-39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual **\*1125** dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga,* 942 F.2d 737, 743 (10th Cir.1991). Once the

moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on their pleadings but must set forth specific facts. *Applied Genetics,* 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment." *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Anderson,* 477 U.S. at 250-51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52, 106 S.Ct. 2505.

*Moses v. Halstead*, 477 F.Supp.2d 1119, 1125 (D. Kan. 2007).

## PLAINTIFF'S RESPONSE TO GEICO'S FIRST
## STATEMENT OF UNCONTROVERTED FACTS

For the purpose of summary judgment, and *only* for the purpose of summary judgment, plaintiff offers the following response to GEICO'S numbered First Statement of Uncontroverted Facts:

1. Uncontroverted.

2. Uncontroverted.

3. Uncontroverted.

4. Uncontroverted.

5. Uncontroverted.

6. Uncontroverted.

7. Uncontroverted.

8. Uncontroverted.

9. Uncontroverted.

10. Uncontroverted.

11. The statement is controverted, in part. It is uncontroverted that on January 14, 2006, six months had passed since the death of Ms. Hoyt. It is uncontroverted that the application of the Kamas nonclaim statute, K.S.A. 59-2239, protected assets of the Estate of Stephanie Hoyt, although this is a legal conclusion and not a statement of uncontroverted material fact. It is *controverted* that the GEICO insurance proceeds were an estate asset that could not be reached by application of the nonclaim statute. The proceeds are not an estate asset. *Kannaday v. Ball*, 44 Kan.App.2d 65, 70-71, 234 P.3d 826 (2010). It is controverted that the nonclaim statute or application of the nonclaim statute barred plaintiff's tort claim against Mr. Ball, Special Administrator of the Estate of Hoyt. Plaintiff recognizes that this too is a legal conclusion. This is a discussion more appropriate for the Arguments and Authorities section of the parties' briefing.

12. Uncontroverted.

13. The statement is controverted, in part. It is uncontroverted that plaintiff's attorney Paul Hasty sent a letter to Sabrina Brantley, Claims Department, GEICO, on January 19, 2006, that stated Ms. Kannaday was, by far, the most seriously injured passenger in the vehicle and she requested the policy limit of $25,000. It is uncontroverted that no medical records were provided to GEICO with this letter. It is controverted that the letter did not contain a "detailed explanation". According to GEICO, before January 19, 2006, it had received Wesley Medical Center's Notice of Hospital Lien as to Rachel Kannaday, for the amount of **$158,929.49** (GEICO's First Statement of Uncontroverted Facts at ¶ 3; GEICO's Doc. 67-4, GCF-0137). The lien is dated August 10, 2005 (GEICO's Doc. 67-4, GCF-0137). According to GEICO, before

January 19, 2006, it knew plaintiff had suffered a fractured pelvis, fractured vertebra, broken left arm, broken left hand, internal damage and a spinal cord injury (GEICO's First Statement of Uncontroverted Facts at ¶ 6). Mr. Hasty's letter stated the obvious and what GEICO and plaintiff both knew, that plaintiff was by far the most seriously injured passenger (GEICO'S First Statement of Uncontroverted Facts at ¶¶ 3-6). The letter also set forth plaintiff's demand.

14. Uncontroverted.

15. Uncontroverted.

16. Uncontroverted.

17. Uncontroverted.

18. The statement is controverted. The Petition speaks for itself as to the date the action by Rachel Kannaday against Charles Ball, Special Administrator of the Estate of Stephanie Hoyt, deceased, Case No. 06-CV-497, file stamped March 17, 2006 (GEICO's Doc. 67-10, Petition, Kannaday-0001-0002), was instituted. The filing speaks for itself as to when the interpleader action was initiated by GEICO (GEICO's Doc. 67-11, Interpleader Complaint filed March 23, 2006).

19. Uncontroverted.

20. Uncontroverted.

21. It is uncontroverted that this Court, Case No. 06-CV-01067-JTM, found plaintiff was not equitably entitled to share in the funds that plaintiff owed to Wesley Medical Center and Wesley Medical Center was equitably entitled to enforce its lien up to the full amount of the interpled funds ($25,000) (Exhibit P, Memorandum and Order at pp. 3-4, interpleader, Case No. 06-CV-1067-JTM (D. Kan.)). The Court ordered the Clerk to pay the interpled funds to Wesley. *Id.* The remainder of the statement is controverted, but immaterial. Plaintiff later settled with

Wesley .  They agreed there would be no appeal taken on her state law claim against Wesley in exchange for Wesley agreeing not to pursue Kannaday for any additional portion of the outstanding hospital bill (Exhibit T, Affidavit, Paul Hasty, Jr.).

PLAINTIFF'S RESPONSE TO GEICO'S SECOND
STATEMENT OF UNCONTROVERTED FACTS

For the purpose of summary judgment, and *only* for the purpose of summary judgment, plaintiff offers the following response to GEICO'S numbered Second Statement of Uncontroverted Facts:

22. Controverted in part.  Mr. Ball contends the Estate is exposed as to after-acquired assets.  Mr. Ball wanted to protect after-acquired assets through settlement.  Mr. Ball's attorney, also attorney for GEICO, paid by GEICO, intentionally waived that issue, without his client's agreement, when he never presented that issue to the Kansas Court of Appeals.  GEICO's counsel ignored Mr. Ball as to that issue.  The agreement also protected Mr. Ball from the expense of protracted litigation, uncertainty of what the outcome would be and the inconvenience of litigation.  Mr. Ball wanted to be released from those concerns by settlement (GEICO's Doc. 67-6, GCF-0073-0074; plaintiff's Exhibit H, Excerpts from deposition of Charles Ball (September 30, 2009), garnishment proceeding, Case No. 09:2255-JWL (D. Kan.); plaintiff's Exhibit I, Excerpts from deposition of Charles Ball (September 27, 2007), *Kannaday v. Ball*, Case No. 06-CV-497 (District Court of Wyandotte County, Kansas)).   It is uncontroverted that Mr. Vix forwarded the proposed settlement agreement to Mr. Ball and that the agreement asked Mr. Ball to agree to an *ex parte* hearing on damages and that the agreement contained a promise not to execute on Estate assets.  Mr. Vix requested a telephone call in his letter to Mr. Ball.  Mr. Vix *never* tried to call Mr. Ball after Mr. Vix forwarded the agreement to Mr. Ball or after Mr. Vix received the executed agreement from Mr. Ball.  *Id.*

23. The statement is controverted, in part. It is uncontroverted that Mr. Ball signed the plaintiff's proposed settlement agreement and returned it to Mr. Vix. It is **controverted** that Mr. Ball did this "without consultation [or] comment." On August 17, 2006, Mr. Vix wrote to his client, Mr. Ball, and notified Mr. Ball that he had received an offer from plaintiff Kannaday to settle her tort claim per the terms of the enclosed settlement agreement (Exhibit E, Fleeson Gooing file, Letter from Mr. Hasty to Mr. Vix dated August 30, 2006, FGCK 0429-0432; Exhibit E, Fleeson Gooing File, Letter from Mr. Vix to Mr. Ball, FGCK 0062-0065; Exhibit G, Lyndon Vix Depo. Excerpts, page 40, lines 7-22). Mr. Ball signed the agreement and returned it to Mr. Vix. That was an obvious statement to Mr. Vix that Mr. Ball wanted to enter the settlement and did so. On October 18, 2006, Mr. Vix received the settlement agreement back from Mr. Ball, which Mr. Ball had executed (Exhibit G, Vix, page 50, lines 17-22). Mr. Vix understood when he received the signed settlement agreement that his client, Mr. Ball, wanted to accept plaintiff's settlement offer (Exhibit G, Vix, page 50, line 23 – page 51, line 13). If Mr. Vix felt further "instruction" was needed, he didn't call his client Mr. Ball. But he did call *GEICO* about the settlement agreement that Mr. Ball executed (Exhibit A, Sabrina Brantley Depo. Excerpts, page 197, lines 4-10; Exhibit G, Vix, page 52, line 25 – page 53, line 8). Mr. Vix then held onto the settlement agreement and did not forward it to plaintiff's counsel or tell plaintiff's counsel it had been executed. The settlement agreement which Mr. Ball executed and forwarded in **2006** to counsel retained by GEICO was held by counsel retained by GEICO until **March 28, 2008** (Exhibit K, Letter from Mr. Townsley of Fleeson Gooing to Paul Hasty dated March 28, 2008).

A Fleeson Gooing attorney did "consult" with Mr. Ball when he told Mr. Ball that he thought they had a defense because the Kannaday claim had not been filed against the Estate within four months. Mr. Ball told his lawyer that he disagreed. He told his lawyer that he didn't think they

were familiar with probate. He told his lawyers they were not following their responsibilities to the client. He was concerned about after-acquired assets. He told his lawyer he thought his lawyer was "just trying to lawyer the case". Fleeson Gooing, through its attorney, accused Mr. Ball of "being in cahoots" with plaintiff. Mr. Ball told his lawyer that Fleeson Gooing was way off base and his lawyer ended the conversation quickly (Exhibit H, Ball, page 66, line 15 – page 69, line 19).

Mr. Ball testified that in this telephone call the lawyer made it clear to Mr. Ball that Fleeson Gooing had made up their mind. Mr. Ball testified he simply could not make the lawyers understand and Fleeson Gooing would not listen to Mr. Ball (Exhibit H, Ball, page 93, line 20 – page 95, line 13).

24. Uncontroverted.

25. Uncontroverted.

26. Uncontroverted.

27. Uncontroverted.

28. The statement is controverted in part. The nonclaim statute did not act as a bar to plaintiff's claim against Mr. Ball, Special Administrator of the Estate of Hoyt. *Kannaday v. Ball*, 44 Kan.App.2d 65, 70-71, 234 P.3d 826 (2010). Mr. Ball contends the Estate is exposed as to after-acquired assets. Mr. Ball wanted to protect after-acquired assets through settlement. Mr. Ball's attorney, who was also GEICO's attorney, paid by GEICO, intentionally waived that issue, without his client's agreement, when he did not present that issue to the Kansas Court of Appeals. GEICO's counsel ignored Mr. Ball as to that issue. The agreement protected Mr. Ball from the expense of protracted litigation, uncertainty of what the outcome would be and the inconvenience of litigation. Mr. Ball wanted to be released from those concerns by settlement

7

(GEICO's Doc. 67-6, GCF-0073-0074; plaintiff's Exhibit H, Ball Depo. Excerpts; plaintiff's Exhibit I, Ball Depo. Excerpts). He wanted protection for himself and the Estate as to after-acquired assets. *Id.*

### PLAINTIFF'S ADDITIONAL STATEMENT OF UNCONTROVERTED FACTS

1.      By September 27, 2005, GEICO knew that plaintiff had been in the hospital for 9 weeks (Exhibit A, Sabrina Brantley Depo. Excerpts, page 143, line 15 – page 144, line 3).

2.      On November 5, 2005, the Stephanie Hoyt claim file at GEICO was assigned to Sabrina Brantley, a claims examiner at that time (Exhibit A, Brantley, page 10, lines 8-10, page 10, line 23 – page 11, line 1).

3.      In handling a claim, once GEICO determines it has coverage and determines its insured is liable, the claim is ripe for settlement when GEICO has sufficient information to determine damages. In dealing with a catastrophic injury, the insurance company [GEICO] does not need every piece of information about the injury  (Exhibit A, Brantley, page 43, lines 4 – 17, page 43, line 22 – page 44, line 1).

4.      Where the insurance company determines there is coverage and the insured has liability, and the injury is catastrophic, the insurance company does not need every piece of information about the injury to determine the damages far exceed the liability insurance limit (Exhibit A, Brantley, page 43, line 22 – page 44, line 1).

5.      The training at GEICO was that liability claims were to be settled as promptly as possible (Exhibit A, Brantley, page 51, lines 3 – 8).

6.      The first note in GEICO's claim file that a reserve had been set was October 24, 2005 (Exhibit A, Brantley, page 80, line 20 – page 81, line 1).

7.     By the time Ms. Brantley was assigned the file (November 5, 2005), GEICO had made the decision that Ms. Hoyt was liable for causing the accident (Exhibit A, Brantley, page 102, line 23 – page 103, line 1).

8.     By the time Ms. Brantley took over the claim file (November 5, 2005), GEICO knew that it had three catastrophic injuries (Exhibit A, Brantley, page 103, lines 2 – 4).

9.     On October 7, 2005, GEICO's claim file was documented that Ms. Gold's original hospital bill was less than $50,000, Ms. Wright's original hospital bill was less than $100,000, and Ms. Kannaday's original hospital bill was almost $160,000 (Exhibit A, Brantley, page 147, line 25 – page 148, line 10).

10.     On the day before Ms. Brantley was assigned the file, it was documented that GEICO made settlement evaluations, not based on the relative injuries sustained by the three passengers or the relative exposure to the insured, but instead based on whether each of the claimants did or did not have their own underinsured motorist coverage ("UIM") (Exhibit A, Brantley, page 149, line 17 – page 150, line 6; Exhibit B, Letter from Lyndon Vix to Paul Hasty, dated February 22, 2006, FGCK 0236 (Pretrial Order, Stipulations at ¶ 4(b)(6),(10)).

11.     Once the file was assigned to Ms. Brantley, she never did anything to try to fix that evaluation based on whether the claimants did or did not have their own UIM coverage instead of the relative injuries and damages sustained by each of the claimants and the exposure to the insured. (Exhibit A, Brantley, page 150, lines 2 – 8).

12.     GEICO's evaluation of the claims with regard to settlement on November 4, 2005, was based on the fact that the adjuster believed that one passenger (Gold) did not have UIM coverage. Therefore, she was offered $25,000. The remaining $25,000 in limits was split with $12,500 being offered to plaintiff and $12,500 being offered to passenger Wright, because

the adjuster believed those two passengers had their own UIM coverage (Exhibit B, February 22, 2006 letter, FGCK 0236; Exhibit C, Excerpts from GEICO Claims Log (Pretrial Order, Stipulations at Paragraph 4(b)(8)), at GAL-0028, entry of 11/4/2005, 9:54 a.m.).

     13.     On October 5, 2005, counsel for Ms. Gold proposed that the $50,000 "per accident" limit of the policy be divided equally among the three passengers (Exhibit A, Brantley, page 156, lines 8 – 15; Exhibit D, Excerpts from GEICO Claims File (Pretrial Order, Stipulations at Paragraph 4(b)(9)), GCF-0110).

     14.     GEICO never responded to the proposal from Gold's attorney that GEICO settle Gold's claims against the Hoyt Estate for 1/3 of $50,000 or a little less than $17,000 (Exhibit A, Brantley, page 156, line 23 – page 157, line 22).

     15.     GEICO never told plaintiff Kannaday or passenger Wright that Ms. Gold was willing to take 1/3 of the limit (Exhibit A, Brantley, page 157, lines 10 – 18).

     16.     GEICO made no response and took no action with regard to Gold's proposal that the $50,000.00 be split (Exhibit A, Brantley, page 175, line 24 – page 176, line 14).

     17.     A month after Gold's attorney proposed the $50,000.00 be split three ways, GEICO offered Gold $25,000 (Exhibit A, Brantley, page 180, lines 6 – 13).

     18.     Ms. Gold suggested settlement for a little less than $17,000 and GEICO then offered her $25,000, something Ms. Brantley did not recall occurring, before it happened in this case (Exhibit A, Brantley, page 180, lines 14 – 21; Exhibit D, Claims File, GCF-0103, GCF-0110).

     19.     GEICO did not propose to the three passengers that GEICO would split the "per accident" limit any way the three of them could agree amongst themselves (Exhibit A, Brantley, page 157, lines 19 – 22).

20.     There was no justification in the file for GEICO taking the position that it would not pay Ms. Gold $17,000 to settle her claims against the GEICO insured, but instead would pay her $25,000 (Exhibit A, Brantley, page 181, lines 6 – 10).

21.     According to GEICO's training procedures, when a claimant indicates the claimant will take $17,000 to settle his/her claims, and GEICO has a duty to its insured to protect the insured as best it can, GEICO should take the $17,000 proposal and save as much as it can (Exhibit A, Brantley page 182, lines 3 – 8).

22.     GEICO received plaintiff's offer to settle for $25,000, dated January 19, 2006 (GEICO's Doc. 67-6, GCF-0097), but made no response to the letter, even though the letter requested an immediate response (Exhibit A, Brantley, page 186, lines 6 – 20).

23.     As of January 19, 2006, GEICO knew plaintiff's medical expenses exceeded the policy limits (GEICO'S Exhibit 67-4, GCF-0137; Exhibit A, Brantley, page 186, lines 6-17).

24.     Fleeson, Gooing, Coulson & Kitch, LLC (hereinafter "Fleeson Gooing"), attorneys at law, were retained by GEICO upon GEICO's receipt of plaintiff's January 19, 2006, offer to settle for policy limits (Exhibit C, GEICO Claims Log, GAL-0033, entries of 1/23/06-1/24/06).

25.     GEICO's counsel advised GEICO that the best protection for GEICO was to interplead the $50,000 "per accident" limit into the Court, "and be relieved of further liability". Counsel further advised that GEICO should move quickly because if any of the claimants were to file suit or accept a settlement, "it would definitely complicate matters". (Exhibit A, Brantley, page 189, lines 3-10; Exhibit C, Claims Log, GAL-0033, entries of 1/24/06, 1/26/06, 1/28/06; Exhibit D, GEICO Claims File, GCF-0095).

11

26.     By letter dated February 22, 2006, GEICO's counsel informed plaintiff's counsel that counsel had been retained by GEICO and plaintiff's settlement proposal of January 19, 2006 was declined; GEICO again offered plaintiff $12,500 to settle her claims (Exhibit E, Excerpts from Fleeson-Gooing File (Pretrial Order, Stipulations at Paragraph 4(b)(6),(10), at FGCK 0236).

27.     GEICO's counsel was notified by facsimile on February 24, 2006 that GEICO's evaluation was wrong; that plaintiff did not have UIM coverage available to her and that was not a rational basis under which to evaluate the claim. GEICO was given another opportunity to settle for $25,000 and was notified that the opportunity would not last very long. Plaintiff's counsel suggested GEICO respond by return fax that the claim was settled (GEICO's Doc. 67-16, at Doc. 67-16-7-1).

28.     On March 2, 2006, there having been no response to Mr. Hasty's letter of February 24, 2006, another letter from Mr. Hasty was faxed to GEICO's attorney, withdrawing plaintiff's offer to settle for $25,000 (Exhibit F, Mr. Hasty's letter dated February 28, 2006, faxed to Mr. Vix on March 2, 2006 (emphasis of underline added to exhibit)).

29.     Mr. Vix, attorney at Fleeson Gooing, thought that an interpleader would provide the greatest protection to GEICO and that was his advice to his client, GEICO (Exhibit G, Lyndon Vix Depo. Excerpts (October 19, 2009), garnishment proceeding, Case No. 09:2255-JWL (D. Kan.), page 62, lines 9-19).

30.     Mr. Vix recognized that settlement with releases would have been the greatest protection for the insured, the Hoyt Estate (Exhibit G, Vix, page 62, line 20 – page 63, line 4).

31.     Mr. Vix thought that if any of the claimants accepted an outstanding offer, it would be helpful to the Estate, but if any claimant accepted a settlement, it complicated the

interpleader action for GEICO (Exhibit A, Brantley, page 189, lines 3-10; Exhibit G, Vix, page 64, lines 17-23).

32.     GEICO never told Mr. Vix, its lawyer, that passenger Gold's attorney had suggested dividing the policy limits equally, three ways (Exhibit G, Vix, page 65, line 25 – page 66, line 3).

33.     GEICO did not give its lawyers the letter from Gold's attorney suggesting division of the policy limits three ways, before Mr. Vix filed the interpleader (Exhibit G, Vix, page 65, lines 21 – 23).

34.     If GEICO had told its lawyers before GEICO made offers to the three claimants that one of the claimants had suggested splitting the proceeds three ways, Mr. Vix would have told GEICO to see if the other claimants would agree and if any one of the claimants was willing to accept an amount of money less than the policy limits, they should settle (Exhibit G, Vix, page 66, lines 4-12, page 68, lines 7-20).

35.     When GEICO had the opportunity to settle plaintiff's claims, it still had the $25,000 (Exhibit A, Brantley, page 95, lines 6-19).

36.     GEICO's counsel told counsel for Gold that he was going to file an interpleader and Gold accepted the $25,000 "per person" limit that had been offered to Gold in November of 2006 (Exhibit C, GEICO Claims Log, GAL-0036, entries of 3/7/06-3/8/06, 3/15/06).

37.     Fleeson Gooing filed GEICO's interpleader complaint, as counsel for GEICO, on March 23, 2006 (GEICO'S Doc. 67-11, Interpleader Complaint, pp. 1, 7).

38.     After filing the interpleader complaint as counsel for GEICO, Fleeson Gooing was authorized by GEICO to represent the Special Administrator of the Hoyt Estate, Charles Ball, in the damage case filed by plaintiff, Case No. 06-CV-497 (District Court of Wyandotte

County) (Exhibit A, Brantley, page 191, lines 11-18; Exhibit C, GEICO Claims Log, GAL-0037).

39. Ms. Brantley was trained by GEICO that when a lawyer was retained to represent the insured, the lawyer owes his duty to the insured, not GEICO (Exhibit A, Brantley, page 60, lines 17 – 22).

40. Ms. Brantley was trained at GEICO that when a lawyer was retained to represent GEICO, the lawyer owed the duty and fidelity to GEICO (Exhibit A, Brantley, page 60, line 23 – page 61, line 2).

41. As soon as Ms. Brantley saw the interpleader complaint, she knew that Fleeson Gooing had filed a lawsuit in the name of GEICO (Exhibit A, Brantley, page 63, lines 7 – 10).

42. Ms. Brantley understands that the duty of the lawyer who filed an interpleader in the name of GEICO was to represent the interests of GEICO (Exhibit A, Brantley, page 67, line 23 – page 68, line 17).

43. Ms. Brantley understood that when she retained a lawyer to represent the Hoyt Estate, the insured in the damage case, Case No. 06-CV-497, that the lawyer was to solely represent the insured Estate, not GEICO (Exhibit A, Brantley, page 70, lines 11-24).

44. Ms. Brantley recognizes that there is a conflict that exists between the company and the insured when there is an issue of exceeding the insured's policy limits (Exhibit A, Brantley, page 83, page 2, line 2 – page 85, line 8).

45. The GEICO training was that when counsel was asked to represent the insured, GEICO could never ask the lawyer to do anything adverse to the interests of the insured (Exhibit A, Brantley, page 117, lines 5 – 12)

46.     The GEICO training was that when counsel was retained to represent GEICO, the lawyer could never be asked to do anything adverse to the interests of GEICO (Exhibit A, Brantley, page 117, lines 13 – 18).

47.     Ms. Brantley recognizes that GEICO had the same lawyer enter the interpleader as counsel for GEICO that GEICO had enter the damage case as counsel for the GEICO insured (Hoyt Estate), and Ms. Brantley does not know to whom the lawyer owed his duty under those circumstances  (Exhibit A, Brantley, page 118, line 18 – page 119, line 4).

48.     The GEICO training was that GEICO must never put an attorney in a conflict of interest position (Exhibit A, Brantley, page 124, line 19 – page 125, line 3).

49.     It became apparent to Ms. Brantley that she could not settle Ms. Kannaday's claim for $12,500.  However, during the time that Ms. Brantley had the file, Ms. Wright never made a claim or responded to the $12,500 offer to her (Exhibit A, Brantley, page 154, lines 9 – 18).

50.     Once Ms. Brantley realized she could not settle Ms. Kannaday's claim for $12,500, she contacted counsel and the attorney recommended that GEICO not enter settlements, just interplead (Exhibit A, Brantley, page 154, line 19 – page 155, line 2).

51.     When Fleeson Gooing wrote to GEICO and suggested the interpleader and stated that it would provide the greatest protection to GEICO, Ms. Brantley never thought about the fact that it would not be providing protection to the GEICO insured (Exhibit A, Brantley, page 187, line 19 – page 188, line 13; Exhibit D, GEICO Claims File, GCF-0095).

52.     Ms. Brantley recognized that if any one of the claimants accepted a settlement, the insured would get a release (Exhibit A, Brantley, page 189, lines 3 – 10).

53.     GEICO never communicated with Mr. Ball, the Special Administrator of the Estate of Hoyt, about the conflict of interest (Exhibit A, Brantley, page 78, line 20 – page 79, line 1).

54.     Mr. Ball was never asked to waive any conflict of interest for his lawyers in representing both him and GEICO (Exhibit H, Charles Ball Depo. Excerpts (September 30, 2009), garnishment proceeding, Case No. 09:2255-JWL (D. Kan.), page 125, line 25 – page 126, line 3).

55.     Mr. Ball never waived any conflict of interest for his lawyers in representing both him and GEICO (Exhibit H, Ball, page 126, lines 4 – 6).

56.     Fleeson Gooing never told their client, Mr. Ball, about any conflict of interest they might have in representing both Mr. Ball, the Special Administrator of the Estate of Hoyt, and GEICO.  Mr. Vix never had any discussions with Mr. Ball about any conflict, nor did Mr. Vix obtain a waiver from Mr. Ball (Exhibit G, Vix, page 37, lines 13-20; Exhibit H, Ball, page 126, lines 13 – 19).

57.     Mr. Vix of Fleeson Gooing understood when he received the first phone call from GEICO and some follow up documentation, that GEICO had made the decision that its driver was at fault and that it had three catastrophic injuries (Exhibit G, Vix, page 20, lines 2 – 19).

58.     At the time Mr. Vix filed the interpleader on behalf of his client, GEICO, Ms. Wright had not made a claim against the Hoyt Estate and she never made a claim to anything in the interpleader action.  She did not answer the interpleader (Exhibit G, Vix, page 21, line 21 – page 22, line 13; page 23, line 10 – page 24, line 5).

59.     Mr. Vix understood that when he took on the representation of GEICO, his duty was to GEICO (Exhibit G, Vix, page 37, lines 9 – 12).

16

60.     GEICO authorized Fleeson Gooing to represent the insured/Hoyt Estate even after counsel had a discussion with GEICO about the issue of a conflict (Exhibit G, Vix, page 38, lines 5-8).

61.     On August 17, 2006, Mr. Vix wrote to his client, Mr. Ball, and notified Mr. Ball that he had received an offer from plaintiff Kannaday to settle her tort claim per the terms of the enclosed settlement agreement (Exhibit E, Fleeson Gooing file, Letter from Mr. Hasty to Mr. Vix dated August 30, 2006, FGCK 0429-0432; Exhibit E, Fleeson Gooing File, Letter from Mr. Vix to Mr. Ball, FGCK 0062-0065; Exhibit G, Vix, page 40, lines 7-22).

62.     Mr. Vix understood that the effect of the settlement agreement proposed by plaintiff would be that a hearing would be held with the Court and if the Court agreed with the evidence, judgment would be entered in favor of the plaintiff and against the defendant.  Mr. Vix understood that would be the end of the claim by plaintiff Kannaday against his client Mr. Ball, the Special Administrator of the Hoyt Estate (Exhibit G, Vix, page 43, lines 7 – 18).

63.     Mr. Vix felt the settlement agreement was not in the best interests of his other client, GEICO, because it set up a bad faith claim (Exhibit G, Vix, page 44, lines 16 – 22).

64.     GEICO told Mr. Vix that it had made offers, not based on the merits of the claims, but based on GEICO assumptions that plaintiff Kannaday and Ms. Gold had UIM coverage under her own policy (Exhibit B, February 22, 2006, letter from Mr. Vix to Mr. Hasty; Exhibit G, Vix, page 13, lines 4-19).

65.     GEICO told Mr. Vix that it made an offer of $12,500 to plaintiff Kannaday because GEICO believed Ms. Kannaday had her own UIM coverage (Exhibit B, February 22, 2006, letter from Mr. Vix to Mr. Hasty; Exhibit G, Vix, page 13, line 25 – page 14, line 4).

66.     Mr. Vix understood that if he or GEICO needed a personal representative of the Estate of Hoyt appointed, there was a vehicle to get that done (Exhibit G, Vix, page 16, lines 10-16).

67.     Mr. Vix agreed that any interested person could have a personal representative appointed for the Estate of Hoyt (Exhibit G, Vix, page 16, lines 17- 20).

68.     If GEICO needed a person to communicate with, obtain consent from, or needed anything else with regard to the claim against the Estate of Hoyt, someone could have been appointed to serve as the representative of the Estate (Exhibit G, Vix, page 16, line 21 – page 17, line 2).

69.     Mr. Vix testified that he knew an interpleader would not get the insured Hoyt Estate released from the claims of the claimants (Exhibit G, Vix, page 17, lines 3-10).

70.     The theory of Fleeson Gooing was that no suit against the Estate could proceed once GEICO had paid the liability limits because Ms. Kannaday had not made a claim against the Estate within four months of the date of death, and if the Court disagreed with that theory, that was going to be unfortunate for the Estate (Exhibit G, Vix, page 45, lines 9-19).

71.     Mr. Vix recognizes that the District Court of Wyandotte County disagreed with him on his theory that Ms. Kannaday could not proceed against the Estate once the insurance proceeds had been exhausted (Exhibit G, Vix, page 57, lines 5-15).

72.     Mr. Vix testified that he had read deposition testimony of Mr. Ball in which Mr. Ball testified that Mr. Ball perceived an exposure to the Estate for after-acquired assets. Mr. Vix disagreed with Mr. Ball (Exhibit G, Vix, page 49, lines 19-25).

73.     Mr. Vix recognized that by settling the case, he would remove any exposure to his client, the Estate, regardless of whether Mr. Vix or Mr. Ball were right or wrong about the existing legal issues (Exhibit G, Vix, page 50, lines 1-9).

74.     GEICO decided there would be no negotiations on Ms. Kannaday's claim because Mr. Vix recommended there be no negotiations and the money simply be deposited with the Court (Exhibit A, Brantley, page 123, lines 1-9)

75.     There was only one telephone conversation, throughout the life of the file, between Feeson Gooing and their other client, Mr. Ball. The Fleeson Gooing attorney told Mr. Ball that he thought they had a defense because the Kannaday claim had not been filed against the Estate within four months. Mr. Ball told his lawyer that he disagreed. He told his lawyer that he didn't think they were familiar with probate. He told his lawyers they were not following their responsibilities to the client. He was concerned about after-acquired assets. He told his lawyer he thought his lawyer was "just trying to lawyer the case". Fleeson Gooing, through its attorney, accused Mr. Ball of "being in cahoots" with plaintiff. Mr. Ball told his lawyer that Fleeson Gooing was way off base and his lawyer ended the conversation quickly (Exhibit H, Ball, page 66, line 15 – page 69, line 19).

76.     Mr. Ball testified that at the time of the one and only telephone conversation that ever occurred between Fleeson Gooing and their other client, Mr. Ball, the lawyers made it clear to Mr. Ball that they had made up their mind. Mr. Ball testified he simply could not make the lawyers understand and Fleeson Gooing would not listen to Mr. Ball (Exhibit H, Ball, page 93, line 20 – page 95, line 13).

77.     There was no training at GEICO that in evaluating an injury case involving a claimant, it made any difference whether the claimant had the claimant's own UIM coverage;

however, that is exactly what GEICO did to evaluate Ms. Kannaday's case (Exhibit B, page 144, line 23 – page 145, line 12).

78.     GEICO's file showed that as early as October 3, 2005, GEICO knew that the only UIM coverage available to Ms. Kannaday was on a policy with the same limits as the liability policy GEICO issued to Hoyt ($25,000.00/$50,000.00) (Exhibit C, GEICO Claims Log, GAL-0022, entries of 9/27/05, 12:23 p.m., 10/3/05, 12:47 p.m.).

79.     Mr. Vix knows that GEICO's evaluation based on UIM limits was simply wrong because the UIM coverage to Ms. Kannaday had the same limits as the liability coverage available to Hoyt (Exhibit G, Vix, page 109, line 19 – page 110, line 25).

80.     Even though Mr. Vix did not believe that GEICO had correctly assessed the claim, GEICO had already made offers, so there was not anything he could do about it (Exhibit G, Vix, page 111, lines 1-15).

81.     Mr. Vix has no recollection that he told his client, GEICO, that it was wrong about Ms. Kannaday having UIM coverage (Exhibit G, Vix, page 111, lines 16-24).

82.     Ms. Brantley was trained at GEICO that if Ms. Hoyt had liability limits of $25,000.00 and Ms. Kannaday had UIM coverage of $25,000.00, Ms. Kannaday could still make a UIM claim (Exhibit A, Brantley,, page 147, lines 5-14).

83.     Mr. Vix never told Ms. Brantley that she was mistaken about the availability of a UIM claim for Ms. Kannaday if Ms. Kannaday's UIM limits were the same as the liability limits on the Hoyt policy (Exhibit A, Brantley, page 147, lines 15-17).

84.     GEICO claims examiner Brantley did not find out she was wrong about UIM coverage, where, in Kansas, the underinsured motorist coverage does not apply if the UIM limit is the same as the liability limit, until the day before her deposition (October 14, 2009). She had

simply been mistaken about that for years (Exhibit A, Brantley, page 150, line 22 – page 151, line 10).

85.     The reason Ms. Brantley did not try to fix the problem with the evaluation of the claims based on UIM coverage was that she was not familiar with Kansas (Exhibit A, Brantley, page 151, lines 19-22, page 171, lines 6-13).

86.     GEICO did not take the opportunity to settle Ms. Kannaday's claim because GEICO had offered $12,500 to Ms. Wright and GEICO had not withdrawn that offer.   Ms. Wright had not accepted; she had never even made a claim while Ms. Brantley was handling the claim file (Exhibit A, Brantley, page 174, lines 2-8).

87.     Once Ms. Brantley read the letter from Gold's attorney suggesting the policy limits be split three ways, she did not take any action with regard to that proposal because she thought Ms. Kannaday had UIM coverage (Exhibit A, Brantley, page 176, line 18 – page 177, line 13).

88.     GEICO's mistake with regard to Ms. Gold's proposal to split the policy limits 1/3 each was never straightened out (Exhibit A, Brantley, page 182, lines 1-20).

89.     Once Fleeson Gooing received the settlement proposal from plaintiff and sent it to Mr. Ball, Mr. Vix had a telephone discussion with GEICO about it (Exhibit A, page 197, lines 4-10; Exhibit G, Vix, page 52, line 25 – page 53, line 8).

90.     At GEICO, all discussions regarding a claim are to be documented in the claim file and all such discussions with regard to this claim are in the file, according to Ms. Brantley (Exhibit A, Brantley, page 195, lines 13-24).

91.     According to Ms. Brantley, there is never a time that the GEICO claims examiner has a discussion with defense counsel and the two of them think the activity should not be

memorialized in the claim activity log, and that did not happen in the handling of the Hoyt claim (Exhibit A, Brantley, page 195, line 25 – page 196, line 5).

92.     Ms. Brantley was trained that any significant event in a claim file had to be documented in the file and the claim file should contain notes of any significant event (Exhibit A, Brantley, page 32, line 8 – page 33, line 4).

93.     The claim file does not contain anything about the discussion between Mr. Vix (counsel of record for both GEICO and counsel of record for Charles Ball, Special Administrator of the Hoyt Estate) and GEICO with regard to the settlement agreement proposed by plaintiff (Exhibit A, Brantley, page 197, lines 9-12).

94.     Plaintiff's counsel located a typographical error in the proposed settlement agreement that he had previously provided to Mr. Vix, on the bottom of the first page.  The agreement provided:

> Whereas, the parties hereto desire to avoid the expense, delay, and inconvenience of attracted (sic) litigation.

That typographical error was pointed out to Mr. Vix by letter of October 4, 2006.  The word was "protracted" not "attracted" litigation (Exhibit E, Fleeson Gooing file, Letter from Mr. Hasty to Mr. Vix dated October 4, 2006, FGCK 0428).

95.     On October 18, 2006, Mr. Vix received the settlement agreement back from Mr. Ball, which Mr. Ball had executed (Exhibit G, Vix, page 50, lines 17-22).

96.     Mr. Vix understood when he received the signed settlement agreement that his client, Mr. Ball, wanted to accept plaintiff's settlement offer (Exhibit G, Vix, page 50, line 23 – page 51, line 13).

97.     Mr. Vix understood that his client, Mr. Ball, had a different opinion about the defendant's exposure than Mr. Vix held and Mr. Vix understood that his client had chosen not to

follow his advice and he understood that his client, Mr. Ball, wanted the case settled by the settlement agreement (Exhibit G, Vix, page 161, line 21 – page 162, line 13).

98.     Mr. Vix decided that just because his client wanted to enter the settlement agreement did not mean that Mr. Vix was obligated to allow that to occur if he thought it was not in his client's best interest (Exhibit G, Vix, page 133, lines 12 – 20).

99.     Even though his client (Mr. Ball) made it clear what he wanted done when he signed the plaintiff's proposed settlement agreement and gave his deposition, on December 27, 2007, in the damages case, *Kannaday v. Ball*, Case No. 06-CV-497 (District Court of Wyandotte County, Kansas), Mr. Vix, in trying to represent both Mr. Ball and GEICO, refused to do what Mr. Ball wanted because he did not think it made sense (Exhibit G, Vix, page 134, line 21 – page 135, line 7, page 136, lines 17 – 23)

100.     Mr. Vix did not see a detriment to his client, Mr. Ball, Special Administrator of the Estate of Hoyt, to entering the settlement agreement with plaintiff, but he did see a detriment to his client, GEICO, in entering the proposed settlement agreement with plaintiff (Exhibit G, Vix, page 53, line 18 – page 54, line 8).

101.     Mr. Ball's deposition was taken in the Wyandotte County damages case on December 27, 2007 (Exhibit I, Charles Ball Depo. Excerpts, December 27, 2007, *Kannaday v. Ball*, Case No. 06-CV-497 (District Court of Wyandotte County, Kansas)).

102.     Mr. Ball acknowledged receiving the settlement agreement (Exhibit I, Ball, page 4, lines 9-14).

103.     Mr. Ball testified he signed the settlement agreement he received, and thought he had retained an executed copy, but could not find it during his deposition (Exhibit I, Ball, page 4, lines 15-23).

104. Mr. Ball testified he sent the executed settlement agreement to counsel retained by GEICO (Exhibit I, Ball, page 4, line 24 – page 5, line 6).

105. Mr. Ball signed the settlement agreement and had his signature notarized before he sent it back to counsel retained by GEICO, and had no idea what happened to it after that (Exhibit I, Ball, page 5, lines 11-18).

106. Another copy of the settlement agreement was presented to Mr. Ball at his December 27, 2007, deposition (the typographical error had been corrected with regard to "protracted") and Mr. Ball signed it at the deposition (Exhibit I, Ball, page 5, line 19 – page 6, line 1, page 7, lines 4-14).

107. Mr. Ball's counsel, who was also counsel of record and actively representing GEICO, proceeded to cross-examine Mr. Ball on issues to further the representation of counsel's other client, GEICO (Exhibit I, Ball, page 8, line 6 – page 21, line 14).

108. Mr. Ball testified that he did not know whether GEICO's position was correct or incorrect. He was not telling them it to abandon its position. He testified he simply thought the claim should be settled (Exhibit I, page 21, lines 17-22).

109. The settlement agreement Mr. Ball signed in 2006 and sent to counsel retained by GEICO and received by Fleeson Gooing in 2006 was held by counsel and not sent to plaintiff's counsel until after a formal request for production for the document was made in the District Court of Wyandotte County, Kansas. There was no response to the request for production within the time allowed by law, so plaintiff attempted, informally, to obtain the discovery without involving the Court (Exhibit J, Plaintiff's Request for Production of Documents to Defendant, *Kannaday v. Ball*, Case No. 06-CV-497 (District Court of Wyandotte County, Kansas) (Pretrial

Order, Stipulations at Paragraph 4(b)(3),(6)); Exhibit E, Fleeson Gooing file, Letter from Mr. Hasty to Mr. Vix dated March 17, 2008, FGCK 0403).

110.    The settlement agreement which Mr. Ball executed and forwarded in 2006 to counsel retained by GEICO was held by counsel retained by GEICO until March 28, 2008 (Exhibit K, Letter from Mr. Townsley of Fleeson Gooing to Paul Hasty dated March 28, 2008).

111.    Mr. Vix testified he understood that in the interpleader lawsuit, his client was GEICO (Exhibit G, Vix, page 14, lines 13-16).

112.    Mr. Vix testified that in representing Mr. Ball, Mr. Vix understood that his duty of fidelity and loyalty was to the Estate and to the personal representative (Mr. Ball) (Exhibit G, Vix, page 37, lines 3-8)

113.    Mr. Vix testified it was obvious to Mr. Vix from and after March of 2006 that a bad faith claim was coming on this case (Exhibit G, Vix, page 75, line 24 – page 76, line 2).

114.    Mr. Vix recognized that the bad faith claim belonged to his client, Mr. Ball, the Special Administrator of the Estate of Hoyt (Exhibit G, Vix, page 79, lines 4-14).

115.    Mr. Vix recognized that the claim of his client, Mr. Ball, for bad faith was a claim against his other client, GEICO (Exhibit G, Vix, page 79, lines 8-12, page 79, line 21 – page 80, line 2).

116.    Mr. Vix saw, from day one, that one of his clients (Mr. Ball, Special Administrator of the Estate of Hoyt) had a bad faith claim against the other client (GEICO), yet he continued to represent both clients (Exhibit G, Vix, page 80, lines 3-8).

117.    Mr. Vix filed the interpleader thinking it would help his one client (GEICO) avoid a bad faith claim by the representative of the Hoyt Estate (his other client) (Exhibit G, Vix, page 81, lines 6-12).

118.     Mr. Vix recognized that the reason that legal counsel does not represent both the insured and the insurance company when there is a possibility of a claim between them is because of that possible conflict (Exhibit G, Vix, page 82, line 22 – page 83, line 2).

119.     Through the settlement agreement executed by Charles Ball, Ms. Kannaday obtained a $7,219,064.37 *ex parte* judgment on March 18, 2009, entered by the District Court of Wyandotte County, Kansas, against defendant Charles Ball, Special Administrator of the Estate of Stephanie Hoyt, deceased (Pretrial Order, Stipulations at Paragraph 4(a)(8)).

120.     The judgment entered in favor of plaintiff Kannaday and against defendant Charles Ball, Special Administrator of the Estate of Stephanie Hoyt, was appealed by defendant through Fleeson Gooing as counsel for defendant (Pretrial Order, Stipulations at Paragraph 4(a)(8)).

121.     Fleeson Gooing represented the defendant with regard to the appeal.  In the brief counsel retained by GEICO filed, on behalf of defendant Mr. Ball, in the Court of Appeals, counsel argued his client did not have the power to enter the settlement agreement, which insulated the Estate from any exposure, and he made that claim without Mr. Ball's authority and, in fact, never discussed it with him (Exhibit G, Vix, page 163, lines 11 – 18).

122.     In the brief filed by Fleeson Gooing in the Kansas Court of Appeals, on behalf of defendant Mr. Ball, counsel made the statement that the facts do not support a claim of bad faith (obviously, the claim that is before this Court).  However, counsel did not have his client's (Mr. Ball's) authority to say that and never discussed it with him (Exhibit G, Vix, page 157, lines 6 – 16).

123.     In the brief filed by counsel retained by GEICO (Fleeson Gooing) in the Kansas Court of Appeals, purportedly on behalf of the other client, Mr. Ball, the statement was made

that GEICO's actions were not in bad faith. Mr. Vix recognizes that he was actually arguing GEICO's position, not Mr. Ball's position (Exhibit G, Vix, page 157, line 17 – page 158, line 7).

124.    In the brief filed in the Kansas Court of Appeals by counsel retained by GEICO (Fleeson Gooing) the argument was made that the agreement that Mr. Ball, as representative of the Estate, entered, to limit any personal exposure to the Estate, was void for lack of consideration and Mr. Vix testified that the client on whose behalf the brief was purportedly filed (Mr. Ball) has never told Mr. Vix to take that position (Exhibit G, Vix, page 159, lines 8-25).

125.    In the brief filed in the Kansas Court of Appeals, by counsel retained by GEICO (Fleeson Gooing), the argument was made that even though Fleeson Gooing sent the settlement contract to Mr. Ball and described it as plaintiff's offer of settlement (which Mr. Ball accepted by signing) it was not an offer at all, but the offer came from Mr. Ball when the settlement agreement was finally forwarded to plaintiff's counsel and that it expired before plaintiff signed the contract. Mr. Vix stated in his deposition that he never spoke to Mr. Ball about making that argument on appeal (Exhibit G, Vix, page 160, line 16 – page 161, line 5).

126.    It was GEICO that asked Fleeson Gooing to try to get the judgment from the District Court of Wyandotte County set aside; Mr. Ball did not do that (Exhibit G, Vix, page 132, line 17 – page 133, line 1).

127.    GEICO has never notified the insured in this case that GEICO reserved any rights to refuse to pay any judgment that might be entered in the case or that GEICO might not pay any judgment that might be entered in the case (Exhibit G, Vix, page 207, lines 1 – 20).

128.    Mr. Vix agreed in his deposition that the Special Administrator (Mr. Ball) was appointed to represent the Estate and that as counsel for Mr. Ball, he had an obligation to keep Mr. Ball advised on what was going on (Exhibit G, Vix, page 26, line 5 – page 27, line 3).

129. When Mr. Vix was retained by GEICO to represent the Hoyt Estate, he wrote to Mr. Ball and told him that he had been retained to represent Mr. Ball as the Special Administrator of the Hoyt Estate (Exhibit G, Vix, page 36, lines 15 – 23).

130. On April 21, 2006, Mr. Vix wrote to Mr. Ball that Mr. Vix would keep Mr. Ball advised of all pertinent developments in the litigation (Exhibit G, Vix, page 38, lines 19 – 25).

131. Mr. Vix has never met Mr. Ball. He has never talked to him on the phone. The only telephone conversation between the attorney retained by GEICO and the client (Mr. Ball) that occurred on the case was one phone conversation between Mr. Ball and another lawyer in Mr. Vix's office (Exhibit G, Vix, page 42, lines 4 – 6, page 50, lines 1 – 13).

132. On December 28, 2006, Mr. Vix wrote to his one client, Mr. Ball, and notified Mr. Ball that the Court had disagreed with Mr. Vix on his theory that the claim could not proceed against the Estate, and again told Mr. Ball that he would keep him advised (Exhibit G, Vix, page 58, lines 8 – 16).

133. After August 16, 2007, until the judgment was entered in March of 2009, counsel for the defendant at Fleeson Gooing did not communicate with Mr. Ball to keep him updated on events in the case (Exhibit G, Vix, page 60, line 13 – page 61, line 18).

134. After Mr. Vix lost the summary judgment motion, Mr. Townsley at Fleeson Gooing took over the case "because it was going into more of a discovery and litigation mode" (Exhibit G, Vix, page 60, lines 13-21).

135. After the case went into "a discovery and litigation mode", Mr. Townsley communicated with one client (GEICO), but did not communicate with the other client (Mr. Ball), according to what Mr. Vix saw in his firm's legal file (Exhibit G, Vix, page 61, lines 11-18).

136.    By letter dated July 15, 2008, GEICO and Mr. Ball's counsel advised GEICO that the lawsuit of *Kannaday v. Charles Ball, Special Administrator of the Estate of Stephanie Hoyt, deceased*, Case No. 06-CV-497 (District Court of Wyandotte County, Kansas), was set for trial on November 3, 2008; however, counsel did not tell the defendant Mr. Ball that his case was set for trial (Exhibit G, Vix, page 71, lines 5 – 19).

137.    The letter of July 15, 2008, from counsel to GEICO, stated that Ms. Kannaday had made an offer to settle for the policy limits, but that letter was sent to GEICO; counsel never told the other client, Mr. Ball, about that offer (Exhibit G, Vix, page 72, line 24 – page 73, line 9).

138.    On November 13, 2008, counsel wrote to GEICO and notified GEICO that the claim of Ms. Kannaday against defendant Ball, Special Administrator of the Hoyt Estate, was then set for trial on March 2, 2009, but no one told the defendant that his case was set for trial in March (Exhibit G, Vix, page 76, lines 3 – 20).

139.    Fleeson Gooing learned in discovery that the total claim made by Ms. Kannaday against the Hoyt Estate was $15,000,000.00.  Counsel reported that to GEICO, but never told the other client, Mr. Ball, the total claim against him (Exhibit G, Vix, page 86, line 17 – page 87, line 6).

140.    In discovery, it was developed that the medical expenses of Ms. Kannaday that had been itemized at that point were approximately $300,000.  That information was given to GEICO.  Counsel did not tell his other client, Mr. Ball (Exhibit G, Vix, page 87, lines 7 – 15).

141.    In discovery, information was developed concerning the kinds of injuries sustained by plaintiff, including the burst fracture and the incomplete spinal cord injury.  Counsel admitted that is the kind of information a client needs to be able to evaluate the severity of

injury. The information was given to GEICO, but not to the defendant Ball (Exhibit G, Vix, page 87, line 16 – page 88, line 4).

142. In discovery in the Wyandotte County case, Case No. 06-CV-497, plaintiff produced expert reports from four experts. Those were provided by Fleeson Gooing to one client (GEICO) and discussed with GEICO, but defendant Ball was never told about them (Exhibit G, Vix, page 85, line 24 – page 86, line 15; page 92, line 24 – page 94, line 4)

143. Mr. Vix advised GEICO with regard to whether there was or was not bad faith on GEICO's part (Exhibit G, Vix, page 96, lines 5-20).

144. Even though Mr. Vix recognized that a bad faith claim against one of his clients (GEICO) belonged to his other client (Mr. Ball), and even though he was actually counsel of record for both GEICO in one case and Mr. Ball in the other, he advised GEICO on August 16, 2006 that there was no merit to a bad faith claim against GEICO (Exhibit C, GEICO Claims Log, CAL-0040; Exhibit G, Vix, page 146, line 3 – page 147, line 13).

145. After the initial judgment was entered in the District Court of Wyandotte County, Case No. 06-CV-497, William Townsley, a Fleeson Gooing attorney, wrote to GEICO on March 31, 2009, and advised GEICO on what it should do in the event a garnishment was served – that GEICO should immediately deny the garnishment which would be to satisfy the judgment against Fleeson Gooing's other client (Mr. Ball) and counsel told GEICO the arguments that counsel thought GEICO should make in response to the garnishment. Counsel admits that Fleeson Gooing was advising GEICO at that point with regard to the bad faith claim that actually belonged to Fleeson Gooing's other client, Mr. Ball (Exhibit D, GEICO Claims File, March 31, 2009 email from Mr. Townsley to GEICO, GCF-0005, GCF-0007; Exhibit G, Vix, page 170, lines 12 – 22).

146.     After the initial judgment was entered in Wyandotte County, Case No. 06-CV-497, in March of 2009, Fleeson Gooing recognized that different counsel should be involved for GEICO and an attorney for Fleeson Gooing told GEICO that different counsel should be involved for GEICO (Exhibit D, GEICO Claims File, March 31, 2009 email from Mr. Townsley to GEICO, GCF-0007; Exhibit G, Vix, page 169, line 21 – page 170, line 11).

147.     Fleeson Gooing, while representing Mr. Ball, had discussions with GEICO's home office legal representative, Mr. Jay Jackson. Mr. Vix refused to testify with regard to his discussion with GEICO (Mr. Jackson) because GEICO has not waived the privilege, although the insured had waived the privilege (Exhibit G, Vix, page 120, line 17 – page 123, line 15).

148.     During his deposition, Mr. Vix protected communications between him and one of his clients (GEICO) from his other client (Mr. Ball) (Exhibit G, Vix, page 120, line 17 – page 123, line 15).

149.     Mr. Vix did not give GEICO any advice about whether they needed to tell Mr. Ball he was being sued in excess of his limit or the effect of that because he thought it would be a conflict of interest to advise one client (GEICO) on what it ought to tell his other client (Mr. Ball) about the excess situation (Exhibit G, Vix, page 144, line 16 – page 145, line 2).

150.     Mr. Vix recognized that once the summary judgment motion was overruled in the District Court of Wyandotte County, Kansas, Case No. 06-CV-497, there was going to be a judgment entered in favor of Ms. Kannaday and against his client, Mr. Ball, Special Administrator of the Hoyt Estate. Mr. Vix did not know whether the initial judgment would stand on appeal. Mr. Vix was willing to take that risk (Exhibit G, Vix, page 131, lines 9 – 19)

151.    Prior to being assigned this claim, the GEICO claims examiner, Ms. Brantley, had no experience with an interpleader, and in fact had never even heard the word (Exhibit A, Brantley, page 27, lines 15 – 24)

152.    Ms. Brantley believed that an interpleader would get GEICO out of the claim. She does not know whether she came to the belief, at some point, that an interpleader would get the insured away from or out of the claim (Exhibit A, Brantley, page 33, lines 13-19).

153.    Ms. Brantley had no information at all about an interpleader other than what Mr. Vix told her (Exhibit A, Brantley, page 44, line 24 – page 45, line 2).

154.    Mr. Vix made the decision that an interpleader would be best and GEICO went along with his recommendation (Exhibit A, Brantley, page 44, lines 18-23).

155.    GEICO gave no consideration in trying to settle the case once it went to Mr. Vix (Exhibit A, Brantley, page 55, lines 11-17).

156.    GEICO told Mr. Vix that he was to handle the settlement discussions (Exhibit A, Brantley, page 56, lines 18-23).

157.    The GEICO Claims Manual directs that when authority to settle is delegated to counsel, claims must explain exactly how the negotiations be conducted.  However, GEICO never gave Mr. Vix that instruction (Exhibit A, Brantley, page 57, line 18 – page 58, line 1).

158.    Even though the interpleader complaint was in her file, Ms. Brantley did not know that Mr. Vix was representing GEICO until just before her deposition was taken on October 14, 2009 (Exhibit A, Brantley, page 59, lines 2 – 11).

159.    Ms. Brantley had to look at the interpleader complaint during her deposition taken October 14, 2009 in order to know that Mr. Vix was the attorney representing GEICO and that

the insured, the Hoyt Estate, was not a party to the lawsuit (Exhibit A, Brantley, page 61, line 25 – page 62, line 15)

160.    Ms. Brantley did not even understand that an interpleader was a lawsuit. She has since learned she was wrong about that (Exhibit A, Brantley, page 65, lines 17 – 22).

161.    Ms. Brantley did not understand that Mr. Vix was representing anyone other than the Hoyt Estate, but she has now discovered that she was incorrect. She learned that in early October, 2009 (Exhibit A, Brantley, page 70, lines 11-19).

162.    During the time that Ms. Brantley had the file, it never occurred to her that Mr. Vix had entered his appearance as a lawyer for GEICO and was representing GEICO (Exhibit A, Brantley, page 71, lines 5 – 7).

163.    Every claims file gets reviewed on a 30-day increment and a 90-day increment by the claims manager (Exhibit A, Brantley, page 71, line 22 – page 72, line 1).

164.    The claims manager never expressed any concern to Ms. Brantley that the lawyer hired to represent the Hoyt Estate had filed a lawsuit in the name of GEICO (Exhibit A, Brantley, page 72, lines 2-7).

165.    When GEICO wanted to talk to someone about the claim, before Mr. Ball was appointed, they talked to Ms. Hoyt's father because Ms. Hoyt was dead (Exhibit A, Brantley, page 74, lines 9 – 12).

166.    Ms. Brantley assumed that after an interpleader, the insured would not be exposed in excess of limits (Exhibit A, Brantley, page 155, lines 6 – 11).

167.    GEICO spent $25,000.00 to settle the claim of the person that had a hospital bill of $44,000.00 (Gold) (Exhibit A, Brantley, page 158, lines 15 – 17).

168.    On February 27, 2006, Ms. Brantley told Ms. Hoyt's father that no claim could be made against the Estate and there was no exposure to the insured (Exhibit A, Brantley, page 159, lines 8 – 21).

169.    It is a red flag to Ms. Brantley whenever she receives a policy limit demand that says if it is not accepted it will be withdrawn and that there is going to be a claim in excess of the limit if GEICO does not settle.  She knew from the first time there was a demand by Ms. Kannaday that the bad faith issue was going to be in the case if she did not pay the policy limit (Exhibit A, Brantley, page 205, lines 9 – 21).

170.    Ms. Brantley's thought process was that if she settled with any one of the claimants, she would want a release to fully protect the insured because that is the object of settlement (Exhibit A, Brantley, page 213, lines 5 – 13).

171.    Ms. Brantley was trained that when the insured has been sued in excess of the policy limit, she is supposed to be particularly vigilant to get the case settled within the limit (Exhibit A, Brantley, page 213, lines 16 – 22).

172.    Here, GEICO never consulted with anyone on behalf of the insured to see what the insured had to say about GEICO's decision to file an interpleader as opposed to trying to settle (Exhibit A, Brantley, page 73, line 24 – page 74, line 8).

173.    This was the first claim Ms. Brantley handled where the insured driver was deceased (Exhibit A, Brantley, page 74, line 25 – page 75, line 3).

174.    Ms. Brantley was trained that one of her responsibilities was to keep the insured advised about all significant events that occur in the claim (Exhibit A, Brantley, page 76, line 22 – page 77, line 2).

175. Ms. Brantley was trained that if she failed to keep the insured advised about what is occurring in a claim, she could establish bad faith against GEICO (Exhibit A, Brantley, page 77, lines 15 – 21).

176. Ms. Brantley has reviewed the claim file. There was never any communication whatsoever from GEICO to the personal representative of the Estate in this case (Exhibit A, Brantley, page 78, line 20 – page 79, line 13).

177. Ms. Brantley was trained at GEICO that if she did not make a proper decision on a claim, the results can be devastating not only to the insured, but also to GEICO because it could lead to a suit for bad faith. That includes the failure to pay the limit when there is an opportunity to do so (Exhibit A, Brantley, page 83, lines 14 – 23).

178. It was Ms. Brantley's obligation to make certain that the insured was aware of any claim in excess of the limits and when that was so, she was required to keep the insured informed throughout the file as events occurred (Exhibit A, Brantley, page 87, lines 12 – 19).

179. The GEICO training was that the adjusters/examiners were to keep the insured informed with regard to testimony of witnesses, experts, and trial dates (Exhibit A, Brantley, page 87, lines 12 – 25).

180. There is never a situation in which the insured has been sued in excess of the policy limit that the adjuster is not to notify the insured. It is not discretionary; it is mandatory. (Exhibit A, Brantley, page 89, lines 7 – 14).

181. GEICO never told Mr. Ball that there had been an opportunity to settle Ms. Kannaday's claim for the policy limit of $25,000 (Exhibit A, Brantley, page 96, lines 15 – 22).

182. There was no reason for GEICO to have failed to tell Mr. Ball about the opportunity to settle for policy limits (Exhibit A, Brantley, page 97, lines 2 – 4).

35

183.    Ms. Brantley did not realize that Mr. Ball was the insured.  She has now learned that she was mistaken about that. (Exhibit A, Brantley, page 97, lines 5 – 22).

184.    It was Ms. Brantley's responsibility to send the letter to the insured that a suit had been filed and the amount sought was in excess of the limit (Exhibit A, Brantley, page 100, lines 19 – 22).

185.    Ms. Brantley was trained that it was her obligation to notify Mr. Ball if he was sued in excess of the limit on the policy and she failed to do it  (Exhibit A, Brantley, page 105, lines 6 – 13).

186.    Ms. Brantley understood the claim exceeded $25,000.00 when she got the Wyandotte County Petition (Exhibit A, Brantley, page 108, lines 20 – 25).

187.    Ms. Brantley was trained that if a lawsuit is filed against an insured and it is defended by GEICO, GEICO must notify the insured if there is any reason GEICO may not pay all of the judgment (Exhibit A, Brantley, page 128, lines 1 – 12).

188.    Ms. Brantley was trained that in some U.S. jurisdictions, the initial suit does not have a specific amount of money claimed (Exhibit A, Brantley, page 129, line 19 – page 130, line 11).

189.    Ms. Brantley was trained that if a lawsuit is filed and the Petition asks for damages in excess of $75,000 or some other general statement, GEICO has provided a specific form letter that Ms. Brantley was to send to the insured because she did not know how much money was actually being sought (Exhibit A, Brantley, page 130, lines 12 – 18).

190.    The letter that Ms. Brantley should have sent to Mr. Ball would have notified him that the claim in the lawsuit was not specified, and he had the right to obtain his own attorney, at his expense, to cooperate with defense counsel and protect his interests for any amount that may

be in excess of the limit (Exhibit L, GEICO Claims Manual (Pretrial Order, Stipulations at ¶ 4(b)(7)) at GCM-0281, Unlimited Excess Ad Damnum Form Letter).

191.     The training at GEICO was that once the exact amount of a lawsuit was known, a second letter had to be sent to the insured, this one to let him know how much was being claimed in the suit (Exhibit A, Brantley, page 130, line 23 – page 131, line 2).

192.     Since Ms. Kannaday's suit was not for a specific amount, GEICO should have sent one letter to Mr. Ball when the suit was filed and a second letter to Mr. Ball when GEICO knew how much money was being claimed.  However, neither was sent (Exhibit A, Brantley, page 131, lines 16 – 25).

193.     The second letter was also a form letter, and it also should have advised Mr. Ball that he had a right to obtain his own attorney at his own expense and that the insurance company would not pay any judgment in excess of the policy limit (Exhibit L, GEICO Claims Manual, GCM-0279).

194.     On December 21, 2006, Judge R. Wayne Lampson stated, within his Memorandum Decision on Motion for Summary Judgment, "[I]t is clear under the provisions of K.S.A. 59-2238, that the plaintiff [Rachel Kannaday] can file an action in tort against the representative of the estate [of Hoyt], and this constitutes a claim against the estate.  The cases which review this provision note that if the filing occurs after the statutory claim period has run, as is the situation in this case, assets of the estate cannot be applied to satisfy any judgment rendered, but the subject of the claim can be.  In this case the subject is the insurance policy of the deceased." (GEICO's Doc. 67-10, Kannaday-0045).

195.    GEICO learned in October of 2008 that Ms. Kannaday's claim was $15,000,000. That should have triggered the second letter to Mr. Ball (Exhibit A, Brantley, page 167, line 22 – page 168, line 8).

196.    The original reservation letter based on policy limit should have been sent on April 12, 2006 (Exhibit A, Brantley, page 161, lines 19 – 25).

197.    On August 16, 2006, there was a second settlement proposal by Ms. Kannaday; GEICO did not convey that to Mr. Ball, Special Administrator of the Estate of Hoyt either (Exhibit A, Brantley, page 163, lines 10 – 14).

198.    On March 17, 2008, plaintiff made another settlement proposal to Mr. Ball (Exhibit E, Fleeson Gooing file, Letter to Mr. Vix from Mr. Hasty, FGCK 0403)

199.    Mr. Ball was never told about the settlement offer from plaintiff dated March 17, 2008 (Exhibit G. Vix, page 103, lines 8-25; Exhibit H, Charles Ball Depo. Excerpts (September 30, 2009), Case No. 09-2255-JWL, page 111, line 21 – page 112, line 5).

200.    Not once did Ms. Brantley ever communicate with Mr. Ball with regard to what settlement negotiations were made or had been made. In fact, she never even communicated with him about anything having to do with this claim (Exhibit A, Brantley, page 92, lines 18-25).

201.    Ms. Brantley does not know why the insured was never advised that the suit was in excess of the limit even though Ms. Brantley was trained that if the company fails to do that, GEICO may be liable for the entire judgment regardless of the limit on the policy (Exhibit A, Brantley, page 100, lines 4-18).

202.    Ms. Brantley was trained that she was to send the letters to the insured notifying the insured that the suit exceeded the limit and that the company would not pay more than the limit and request that the insured sign one copy of that and send it back. If the insured did not do

that, she was to send the letters Certified Mail.  None of those things happened with regard to the Hoyt claim (Exhibit A, Brantley, page 101, lines 12 – 24).

203.    Any time a letter or call was received that threatened excess liability, Ms. Brantley was to immediately discuss the case with a claim supervisor.  She did not do that in this case.  (Exhibit A, Brantley, page 107, lines 10 – 23).

204.    Ms. Brantley does not know why she did not discuss the case with her supervisor when she knew there was an excess claim (Exhibit A, Brantley, page 109, line 24 – page 110, line 4).

205.    If there is any reasonable probability that a claim would have a potential recovery value in excess of the policy limit, the claim supervisor is to discuss it with the regional liability administrator.  Ms. Brantley understood there was a reasonable probability that Ms. Kannaday's claim would have a potential recovery value in excess of $25,000.00 (Exhibit A, Brantley, page 110, lines 5 – 15).

206.    Mr. Brantley received notice of the lawsuit filed in the District Court of Wyandotte County, Kansas, Case NO. 06-CV-497, on April 6, 2006.  She did not discuss the claim with the regional liability administrator until October 4, 2006 (Exhibit A, Brantley, page 111, lines 6 – 16)

207.    Ms. Brantley never advised Mr. Ball of significant events in the lawsuit as they occurred (Exhibit A, Brantley, page 114, lines 9-16).

208.    Ms. Brantley does not remember having a discussion with Mr. Vix that he was to assume GEICO's duty of communicating with the insured, and in fact she was trained that it would not have been permissible for her try to delegate her responsibility to the lawyer (Exhibit A, Brantley, page 114, line 17 – page 115, line 20).

209.     GEICO never asked Mr. Vix to take over the company's responsibility for keeping the defendant advised (Exhibit G, Vix, page 25, line 25 – page 26, line 4).

210.     Ms. Brantley knew that once the lawsuit was filed by Ms. Kannaday against Charles Ball, the Special Administrator of the Hoyt Estate, it was still her responsibility to direct settlement efforts (Exhibit A, Brantley, page 116, lines 1-5).

211.     After Ms. Kannaday's suit was filed, Ms. Brantley did not direct any settlement efforts at all because Mr. Vix was handling the case and she was not familiar with the law (Exhibit A, Brantley, page 116, lines 6-14).

212.     One of the things that can be done where the injury is catastrophic in order to try to control the claim is to make an advanced payment, but no advance payment was ever offered to plaintiff Kannaday (Exhibit A, Brantley, page 51, lines 14 – 17; page 51, lines 22 – 23).

213.     Ms. Brantley was supposed to be supervising Mr. Vix, but she did not know how she could have done that because she did not know what an interpleader was all about (Exhibit A, Brantley, page 53, lines 5 – 9).

214.     Ms. Brantley was trained that she could use a partial settlement that does not involve a release in the case of a catastrophic injury, but she never thought about it in this case (Exhibit A, Brantley, page 53, line 19 – page 54, line 17).

215.     The GEICO Claims Manual refers to a settlement technique of a "walk away settlement", but Ms. Brantley does not know what that is and nothing like that was attempted in the case (Exhibit A, Brantley, page 56, lines 6 – 17).

216.     Ms. Brantley knew by April 17, 2006, that GEICO had service of process on all of the parties in the interpleader other than Wesley Medical Center (who only had a claim of lien), and it was Ms. Brantley's responsibility during that period of time to be taking steps to best

protect the interest of the Hoyt Estate. Ms. Wright had never made a claim while Ms. Brantley was handling the claim file. Nothing was done to try to settle with Ms. Kannaday for the $25,000 and dismiss the interpleader (Exhibit A, Brantley, page 192, lines 8 – 23).

217.    When claim files are reviewed, omissions are noted and reminders are sent (Exhibit A, Brantley,  page 198, lines 19 – 23).

218.    The training at GEICO is that GEICO is to provide the same kind of information about a suit to the insured that Ms. Brantley expects counsel to give her (Exhibit A, Brantley, page 199, lines 6 – 10).

219.    The correspondence from counsel to GEICO about events in the case after the District Court of Wyandotte County overruled the defendant's summary judgment motion (with regard to experts, amounts of the claim, damages, injuries, and things of that nature) contain the exact kind of information that GEICO should have been providing to Mr. Ball, but it was not done (Exhibit A, Brantley, page 199, line 22 – page 200, line 19; page 201, lines 11 – 17; page 202, line 19 – page 203, line 7).

220.    There was no reason in the claim file for GEICO to have been withholding information from Mr. Ball with regard to injuries, claims, damages, or experts (Exhibit A, Brantley, page 203, lines 8 – 10).

221.    Defense counsel at Fleeson Gooing never talked to Mr. Ball about anything in the lawsuit after Mr. Ball's December 2007 deposition in the damage case and never talked to him about anything in the appeal (Exhibit H, Ball, page 104, line 20 – page 105, line 8).

222.    Mr. Ball recognized that the settlement agreement in 2006 was an offer from the plaintiff to settle the claim and he signified his acceptance of the offer by signing the contract and sending it back to Fleeson Gooing (Exhibit H, Ball, page 110, line 24 – page 111, line 11).

223.     Mr. Ball never told Fleeson Gooing to refuse to send the settlement agreement back to plaintiff's counsel (Exhibit H, Ball, page 111, lines 17 – 20).

224.     Mr. Ball was told by Fleeson Gooing that "[w]e don't need to settle…" because there were not any assets (Exhibit H, Ball, page 117, line 12 – page 118, line 14).

225.     Mr. Ball intended, when he signed the settlement agreement, to avoid any possible exposure to the Estate and himself above the insurance proceeds (Exhibit H, Ball, page 124, line 24 – page 125, line 10).

226.     Fleeson Gooing told Mr. Ball that they thought they had an absolute defense and they could do what they wanted (Exhibit H, Ball, page 136, lines 10 – 24).

227.     The GEICO training was that the adjuster was to direct the lawyer in defending the suit and outline the material that was to be obtained through discovery and the form of discovery, including persons to be deposed.   That was not done in this case.   (Exhibit A, Brantley, page 121, line 23 – page 122, line 5).

228.     When the suit was filed by Ms. Kannaday and sent to a lawyer, the adjuster was to write a suit referral letter (Exhibit A, Brantley, page 119, lines 12 – 17)

229.     The suit referral letter must identify any potential exposure in excess of the policy limits in light of the facts, the damages, and the amount claimed. The letter should also provide the attorney with a copy of the reservation of rights with regard to the excess claim. None of that happened in this case. (Exhibit A, Brantley, page 120, line 12 – page 121, line 4)

230.     The suit referral letter would have been another opportunity for someone to realize that GEICO had never notified the insured that the suit was in excess of the limit and GEICO had never reserved its rights to refuse to pay anything in excess of the limit (Exhibit A, Brantley, page 121, lines 5 – 8).

231.   At no time did GEICO ever tell Mr. Ball that GEICO would refuse to pay anything in excess of $25,000 on the Ms. Kannaday claim (Exhibit A, Brantley, page 121, lines 9–22).

232.   The suit referral letter was supposed to give the adjuster's opinion as to the value and the status of settlement negations.  None of that happened (Exhibit A, Brantley, page 122, lines 6 – 13).

233.   Ms. Brantley was not trained by GEICO that if there is a case of liability and catastrophic injury, she should stop trying to settle the case (Exhibit A, page 124, lines 9-13).

234.   The excess letter should have been sent to Mr. Ball, the personal representative of the estate, but it was not (Exhibit A, Brantley, page 127, lines 4-16).

235.   Ms. Brantley was trained that if GEICO defended the lawsuit and did not notify the insured that GEICO may not pay all of the judgment, GEICO may owe it all.  However, she never notified Mr. Ball that GEICO would not pay anything in excess of $25,000.  (Exhibit A, Brantley, page 128, lines 5 – 16).

236.   Ms. Brantley was trained that a home office file was mandatory and had to be established promptly whenever there were catastrophic injuries, but this file was first referred to home office for monitoring on October 5, 2006 (Exhibit A, Brantley, page 133, line 16 – page 134, line 14)

237.   There are no circumstances in which the adjuster is allowed to fail to report to home office when a file met any of the guidelines for home office control; it's not discretionary (Exhibit A, Brantley, page 137, lines 6 – 9)

238.    When the adjuster refers a file to home office, there are people there that have more experience and more involvement with more serious cases and have good ideas on claim handling and negotiation (Exhibit A, Brantley, page 137, line 19 – page 138, line 6).

239.    On October 12, 2006, a home office lawyer documented in the claim file that the $25,000 had been offered to Ms. Gold because *she* was the most seriously injured (Exhibit C, GEICO Claims Log, GAL-0041).

240.    There was nothing that indicated that Ms. Gold was the most seriously injured person of the three passengers (Exhibit A, Brantley, page 164, lines 15 – page 165, line 12; Exhibit G, Vix, page 29, lines 17 – 24, page 147, line 23 – page 148, line 23).

241.    As the claim progressed, Ms. Brantley learned that one of the passengers (Ms. Wright) was also a GEICO insured.  A separate claim file was set up with regard to that insured that was distinct from the claim file set up with regard to the insured, Hoyt (Exhibit A, Brantley, page 45, lines 11-19).

242.    The GEICO policy is that if there is more than one insured involved in an accident, separate claim files are set up and they are not intermingled.  (Exhibit A, Brantley, page 46, lines 3 – 7).

243.    If information is developed in a claim with regard to GEICO's duty to pay on behalf of the insured as opposed to the claim against the insured, all of that information is put in the same claim file and the adjuster responsible for protecting GEICO has access to all of the information put in the file by the adjuster responsible for protecting the insured (Exhibit A, Brantley, page 48, line 18 – page 50, line 2).

244.    GEICO refused to reveal to its insured all of the entries in his claim file with regard to the accident, and has claimed they are privileged from the insured (Exhibit C, GEICO Claims Log at GAL-0041 is an example).

245.    GEICO took the position that it does not have to reveal to its insured all of the entries in his claim file, in even though the adjuster responsible for protecting GEICO had access to all of the information in the claim file on the claim against the Hoyt Estate (Exhibit A, Brantley, page 48, line 18 – page 50, line 2).

246.    Ellen Jahnke was a continuing unit examiner with GEICO at the time she left her employment with GEICO in July of 2012 (Exhibit N, Ellen Jahnke Depo. Excerpts, page 5, lines 6-7, 19-21).

247.    As a continuing unit examiner, Ms. Jahnke was "kind of the top dog of the chain" and she handled bad faith claims, fatalities, and difficult coverage cases (Exhibit N, Jahnke, page 5, lines 22-25).

248.    During the time Ms. Jahnke was a continuing unit examiner at GEICO, the difference between a GEICO claims adjuster and a GEICO continuing unit examiner was a claims adjuster would not handle anything that involved lawsuits; once a claim went into litigation, it was supposed to go to the continuing unit (Exhibit N, Jahnke, page 6, lines 6-19).

249.    Before leaving her employment with GEICO, Ms. Jahnke was a continuing unit examiner for 16 of the 18 years she was employed by GEICO (Exhibit N, Jahnke, page 6, lines 20-24).

250.    Ms. Jahnke was the GEICO fourth adjuster assigned to the Hoyt claim file (Exhibit N, Jahnke, page 14, lines 10-15).

251.    All of Ms. Jahnke's training in handling claims came from GEICO (Exhibit N, Jahnke, Page 17, lines 8-13).

252.    GEICO trained Ms. Jahnke that good faith was protecting insureds and then GEICO with the examiner's first concern being the protection of the insured, within in the terms of their policy coverage (Exhibit N, Jahnke, page 17, Line 21 – page 18, line 7).

253.    Ms. Jahnke testified that generally she tried to avoid interpleaders because she always wanted to obtain a full release for the insured in order to protect the insured (Exhibit N, Jahnke, page 22, lines 5-9).

254.    Ms. Jahnke was assigned the Hoyt claim file in June 2008 (Exhibit N, Jahnke, page 25, lines 2-4).

255.    Ms. Jahnke testified that she did not see a conflict, in this case, where the insured was sued in excess of the limit because the only real assets that were at risk were those of GEICO in that there were no assets of the Estate of Hoyt (Exhibit N, Jahnke, page 29, line 22 – page 30, line 11).

256.    When Ms. Jahnke was assigned the Hoyt claim file, she understood it was her duty to protect Ms. Hoyt's Estate and its representative, Mr. Ball (Exhibit N, Jahnke, page 31, lines 19-23).

257.    Ms. Jahnke, at the time of her deposition, could not recall a situation that occurred while she was employed at GEICO where a claimant, through counsel, indicated a willingness to settle at a particular figure, but GEICO wanted to pay the claimant *more* and did pay the claimant more than was requested (Exhibit N, Jahnke, page 34, lines 12-17).

258.    Ms. Jahnke testified that as a GEICO adjuster, one of her jobs was to obtain a release for the insured within the policy limits (Exhibit N, Jahnke, page 34, lines 18-21).

259.    As to a situation where policy limits are $50,000, if Ms. Jahnke had an opportunity to settle one claim for $17,000, instead of $25,000, she would want to do that because it would make more of the $50,000 limits available, and thereby protect the insured (Exhibit N, Jahnke, page 35, line 22 – page 36, line 7).

260.    Ms. Jahnke testified that she was trained at GEICO that there should be enough information in the claim diary entries to explain what happened during every conversation that occurred with regard to a claim (Exhibit N, Jahnke, page 36, line 18 – page 37, line 4).

261.    During the time that Ms. Jahnke was responsible for protecting the Hoyt Estate as the GEICO examiner, she never communicated with Mr. Ball (Exhibit N, Jahnke, page 38, Line 25 – page 39, Line 3).

262.    Ms. Jahnke recognized that Mr. Ball was the insured that she was assigned to protect, but she did not communicate with him because, at that time, Mr. Ball had an attorney appointed by GEICO, Bill Townsley of Fleeson Gooing, who was also the attorney representing GEICO, at the time Ms. Jahnke handled the Hoyt claim file (Exhibit N, Jahnke, page 39, line 6-14).

263.    Mr. Townsley represented to Ms. Jahnke that Mr. Townsley was keeping Mr. Ball advised about the events that were occurring in the case (Exhibit N, Jahnke, page 40, lines 19-24).

264.    Ms. Jahnke testified that she believed Mr. Townsley was notifying Mr. Ball of trial dates, testimony of witnesses, experts, that kind of thing; however, Ms. Jahnke did not recall ever seeing any communications from Mr. Townsley directed to Mr. Ball (Exhibit N, Jahnke, page 74, Lines 16-23, page 75, lines 5-10, page 75, lines 9-11).

265. Ms. Jahnke testified that she understood GEICO was keeping Mr. Ball and the Hoyt Estate advised on the developments in the claim against the Estate because she believed Mr. Townsley of Fleeson Gooing was doing it (Exhibit N, Jahnke, page 75, lines 5-10).

266. Ms. Jahnke, at the time that she was handling the Hoyt claim file, thought Mr. Ball should allow GEICO to defend the claim as it saw fit because Ms. Jahnke believed the end result might be that whatever was awarded against the Hoyt Estate would be something that GEICO might have to pay. In connection with that thought process, she thought was protecting both the insured and GEICO (Exhibit N, Jahnke, page 46, lines 9-17).

267. Ms. Jahnke testified she understood that by entering the settlement agreement with plaintiff, Mr. Ball obtained a complete release of the Estate and she thought that was in his (Mr. Ball's) best interests. However, she did not really think that was in the best interests of GEICO (Exhibit N, Jahnke, page 48, lines 13-21, page 50, lines 22-25).

268. While Ms. Jahnke was handling the Hoyt claim file as the continuing unit examiner, GEICO took steps to invalidate the settlement agreement that Mr. Ball entered with plaintiff Kannaday (Exhibit N, Jahnke, page 52, lines 6-9).

269. Ms. Jahnke, during her deposition, could not think of any benefit to the Estate to having the settlement agreement set aside and looking back to the time period that she was handling the Hoyt claim file, she could not think of any reason for believing there was some benefit to the Estate in having that settlement agreement set aside (Exhibit N, Jahnke, page 53, lines 5-16).

270. Ms. Jahnke testified that she did not approach the claim with Ms. Kannaday with the idea that GEICO would consent or agree to the judgment first entered by Judge Boal of the District Court of Wyandotte County, in return for a complete release of the Estate, "[b]ecause

generally my understanding or what I have seen -- had seen in the past is whatever [sic] consent to that type of judgment, they'd turn around and try to execute it against GEICO. So why would we consent to a judgment like that?" (Exhibit N, Jahnke, page 57, lines 8-18).

271.    Ms. Jahnke testified that her mindset, described in the paragraph immediately preceding this paragraph, was that she was still protecting both GEICO and the Estate (Exhibit N, Jahnke, page 57, lines 19-25).

272.    Ms. Jahnke was trained by GEICO that when there was a claim against the insured in excess of the limit, her loyalty was to GEICO *and* the insured, *both* (Exhibit N, Jahnke, page 58, lines 1-6).

273.    To Ms. Jahnke's knowledge, there was never a notice sent to the Hoyt Estate that GEICO would not pay whatever judgment was entered in the case (Exhibit N, Jahnke, page 64, lines 22-25).

274.    Ms. Jahnke testified that she understood that, as a GEICO examiner, when she retained an attorney to represent an insured, the attorney owed his duty to the insured, but that when she retained counsel to represent GEICO on something, like an uninsured motorist claim, the attorney owed his duty to GEICO (Exhibit N, Jahnke, page 69, line 17 – page 70, line 5).

275.    As to the Hoyt claim, Ms. Jahnke believed attorney Mr. Townsley's and his firm's duty was going to be owed to both GEICO and the insured Estate (Exhibit N, Jahnke, page 70, lines 6-12).

276.    Ms. Jahnke was trained at GEICO that the file handler's failure to keep the insured advised about the developments of the case could establish bad faith (Exhibit N, Jahnke, Page 73, Lines 18-21).

277.    Ms. Jahnke was trained at GEICO that the insurance company cannot pass off its duty to the insured, to keep the insured advised, to defense counsel and rely on defense counsel to do the advising (Exhibit N, Jahnke, page 73, line 22 – page 74, line 1).

278.    Ms. Jahnke testified that if there were any settlement demands made by plaintiff Kannaday while Ms. Jahnke was responsible for the claim file, it was her job to tell the insured of that demand(s) (Exhibit N, Jahnke, page 77, lines 15-21).

279.    According to Ms. Jahnke's testimony, the presence of underinsured motorist coverage does not have anything to do with assigning a claim a value (Exhibit N, Jahnke, page 81, lines 9-13).

280.    Ms. Jahnke was trained by GEICO that she should always try to settle a case where the GEICO insured was determined to be liable, as promptly as possible (Exhibit N, Jahnke, page 81, lines 14-20).

281.    While handling the Hoyt claim file, Ms. Jahnke asked Mr. Townsley to forward a letter to Mr. Ball to let Mr. Ball know that GEICO thought an appeal should be taken on the issue of whether suit could proceed against the Estate since the claim period, pursuant to the Kansas non-claims statute, had run (Exhibit N, Jahnke, page 82, lines 1-23).

282.    Ms. Jahnke testified that GEICO felt there was no conflict between the interests of the insured and the interests of GEICO and GEICO believed it was the best thing to do, to appeal (Exhibit N, Jahnke, page 83, line 15 – page 84, line 2).

283.    Ms. Jahnke became involved in coverage defenses on this claim file, even though it was her job to protect the Estate.  Ms. Jahnke testified that she was not trained by GEICO that if she was representing the insured for GEICO, she should or could also be involved in coverage defenses (Exhibit N, Jahnke, page 86, lines 2-11).

284.    Ms. Jahnke told attorney Mr. Townsley to send Mr. Ball a letter saying that GEICO was going to take the appeal and Mr. Townsley drafted the letter. Mr. Townsley's letter to Mr. Ball told Mr. Ball that the issue of whether the Kannaday claim could proceed to judgment, if it wasn't made within the nonclaim period, could proceed, was going to be appealed (Exhibit N, Jahnke, page 87, Line 7 – Page 88, line 12).

285.    The appeal referenced in the letter from Mr. Townsley to Mr. Ball, sent at the request of Ms. Jahnke, did not inform Mr. Ball of all of the issues that were going to be appealed by the attorney retained by GEICO to represent Mr. Ball, Special Administrator of the Estate, and GEICO (Exhibit N, Jahnke, page 88, lines 19-21).

286.    According to Ms. Jahnke, the decision was made that in addition to appealing the issue Mr. Ball was informed of, GEICO would have Mr. Townsley appeal whether the settlement agreement with plaintiff that Mr. Ball entered was any good, and the appeal of that issue would be brought in Mr. Ball's name (Exhibit N, Jahnke, page 89, lines 3-10).

287.    Ms. Jahnke recognized that the insured, Mr. Ball, before the appeal occurred, could have told GEICO that the insured did not want anyone attacking the settlement agreement entered by Mr. Ball and Kannaday because it protected Mr. Ball and the Estate. However, GEICO attacked the settlement agreement on appeal, anyway, without first telling Mr. Ball that issue would be raised (by him) on appeal (Exhibit N, Jahnke, page 89, line 23- Page 90, line 4).

288.    According to Ms. Jahnke, if Mr. Ball was not informed that the settlement agreement would be attacked on appeal, he should have been (Exhibit N, Jahnke, page 89, lines 17-22).

289.    Ms. Jahnke testified that she was not aware of any other notice going to the insured (Mr. Ball, Special Administrator of the Estate of Hoyt) that told the insured the

settlement agreement between Kannaday and Ball was going to be attacked on appeal; an appeal taken in the name of the insured, Mr. Ball, Special Administrator of the Estate (Exhibit N, Jahnke, page 90, lines 5-10).

290.    After the initial judgment was entered by the District Court of Wyandotte County, Kansas, in an email exchange on which Ms. Jahnke was copied, Mr. Townsley told GEICO's in-house attorney Mr. Jackson, by e-mail, on April 9, 2009, that Mr. Townsley believed he could not present an issue to the Court that the settlement agreement is invalid; Mr. Jackson disagreed (Exhibit N, Jahnke, Page 93, Line 15 – Page 94, Line 11).

291.    In this email exchange of April 9, 2009, Mr. Townsley told Mr. Jackson that in a situation where the insured approves a settlement that produces a favorable result for the insured, the insured is not well positioned to challenge that result on appeal.   Mr. Jackson told Mr. Townsley to attack the settlement agreement anyway, on appeal (Exhibit N, Jahnke, page 94, lines 12-20).

292.    Ms. Jahnke testified that at the time of the appeal, she thought she was exercising good faith to Mr. Ball when she told him that an appeal was going to be made on one issue, and the appeal actually asked the appellate court to set aside a settlement agreement that was favorable to the insured, without notifying the insured. Ms. Jahnke testified that looking back at the situation at the time of her deposition, she realized she was wrong in believing she was acting in good faith (Exhibit N, Jahnke, page 98, lines 1-11).

293.    Mr. Townsley communicated with Ms. Jahnke on April 29, 2009, by email and she responded that she thought Mr. Townsley was going to argue on appeal that Mr. Ball exceeded his authority as personal representative when he signed the settlement agreement. When asked how that could be in the best interests of the person Ms. Jahnke was supposed to be

protecting, she testified, "I honestly don't recall my mental process at the time." (Exhibit N, Jahnke, page 100, Line 10 – page 101, line 6).

294. In this same email exchange, Mr. Jackson, counsel for GEICO, states that he understands the argument Ms. Jahnke inquired about was an uncomfortable argument for Mr. Townsley's office to make (Exhibit N, Jahnke, page 102, lines 1-7).

295. In July of 2007, passenger Wright first made a claim (Exhibit N, Jahnke, Page 115, line 23 – Page 116, line 5).

296. In October of 2009, Ms. Jahnke sent an email to Mr. Jackson documenting that it was in GEICO's best interests not to file an appeal brief before adjuster Sabrina Brantley's deposition occurred (Exhibit N, Jahnke, page 121, lines 9-22).

297. Ms. Jahnke testified that she understood that when a judgment was entered against an insured in excess of the limit, the insured has a bad faith claim against the insurance company and Ms. Jahnke testified she could not recall her reason for believing, at the time she handled the Hoyt file, that the interests of the insured (Mr. Ball, Special Administrator) and GEICO were one and the same where the bad faith claim against GEICO belonged to the insured (Mr. Ball, Special Administrator) (Exhibit N, Jahnke, page 122, lines 4-15).

298. Mr. Townsley sent an email to Ms. Jahnke dated June 18, 2010, in which he told her that the Court of Appeals decision was greatly favorable and that the consent judgment was voided; however, Mr. Townsley, to Ms. Jahnke's recollection, did not explain how that could possibly be favorable to his client, Mr. Ball, Special Administrator (Exhibit N, Jahnke, page 123, lines 12-24).

299. Ms. Jahnke testified that she could not explain, at the time of her deposition, how the voiding of the consent judgment entered by Mr. Ball and plaintiff could possibly be favorable

to the insured, Mr. Ball, Special Administrator of the Estate (Exhibit N, Jahnke, page 123, line 25 – page 124, line 2).

300.    Ms. Jahnke contacted Todd Barrett, an attorney in Kansas City, and retained Mr. Barrett to see if he could get a co-administrator of the Hoyt Estate appointed with Mr. Ball (Exhibit N, Jahnke, page 132, lines 1-24).

301.    Ms. Jahnke testified that looking back at the situation at the time of her deposition, she recognized the effort to appoint a co-administrator was a conflict between GEICO and the person she was supposed to protect, Mr. Ball, the Special Administrator (Exhibit N, Jahnke, page 133, line 5 – page 134, line 3).

302.    By letter dated August 8, 2011, plaintiff Kannaday again made an offer to settle plaintiff's claims against the Estate. Ms. Jahnke did not communicate that offer to Mr. Ball and that was a mistake; Ms. Jahnke recognized it was her duty to communicate settlement offers to the insured and that was her training at GEICO (Exhibit N, Jahnke, page 134, line 19 – page 135, line 10).

303.    Ms. Jahnke signed a petition, under oath, that was filed in the Kansas probate court, on behalf of GEICO Indemnity Insurance Company, *against Mr. Ball* (Exhibit N, Jahnke, page 139, line 14 – page 140, line 20).

304.    Ms. Jahnke testified that, at the time of her deposition, she did not know and could not say how signing that probate petition was protecting both the interests of the Estate and GEICO (Exhibit N, Jahnke, page 139, line 14 – page 140, line 24).

305.    Attorney Mr. Barrett told Ms. Jahnke that her desire to have Mr. Ball replaced did not have much chance of success (Exhibit N, Jahnke, page 141, lines 1-3).

306. Ms. Jahnke testified that she wanted Mr. Ball replaced as the Special Administrator, but as of the time of her deposition, she could not explain how that replacement would have protected the Estate (Exhibit N, Jahnke, page 141, lines 4-13).

307. At the time the petition was filed in the probate court, Ms. Jahnke was handling a claim involving GEICO wanting to have the Special Administrator (Mr. Ball) replaced, at the same time she was handling a claim that had been made against the Special Administrator (Mr. Ball) (Exhibit N, Jahnke, page 142, lines 8-21).

308. The petition filed by GEICO, signed by Ms. Jahnke, in the probate court in Kansas, was dismissed after the court ordered that Ms. Jahnke was to appear for a deposition in Kansas and GEICO would have to pay the Special Master appointed on that case (Exhibit N, Jahnke, page 145, lines 18-22).

309. There is nothing in the GEICO claims manual that says the GEICO continuing unit examiner is *not* to communicate with the insured (on a personal injury liability claim) unless the insured *asks* the examiner to communicate and there is nothing in the manual that says the examiner is *not* to communicate with the insured if counsel is involved (Exhibit N, Jahnke, page 151, lines 6-14).

310. Ms. Jahnke testified that she did not see a conflict between client Mr. Ball and client GEICO (clients of Fleeson Gooing) because legal counsel told her there was no conflict (Exhibit N, Jahnke, page 153, lines 5-17, page 157, Line 2 – page 158, line 4).

311. Mr. Jackson and Ms. Jahnke, during her time as the examiner on the Hoyt claim file, discussed that Mr. Townsley could not file anything to remove Mr. Ball as the estate representative because Mr. Ball is Mr. Townsley's client and Mr. Townsley told Ms. Jahnke that

Mr. Townsley had a conflict. Ms. Jahnke got permission to use a different lawyer to try and remove Mr. Ball (Exhibit N, Jahnke, page 170, lines 6-25).

312.    Mr. Townsley told Ms. Jahnke that Mr. Ball was not smart enough to realize the position that counsel for plaintiff Kannaday had put him in, that Mr. Ball could be accused of collusion (Exhibit N, Jahnke, page 172, line 20 – page 173, line 4).

313.    Ms. Jahnke spoke with Mr. Barrett and Mr. Barrett advised Ms. Jahnke that he would look around to see if there was some reason to get Mr. Ball disqualified as Special Administrator (Exhibit N, Jahnke, page 173, lines 5-10).

314.    Debra Beasley is a senior claims examiner at GEICO and she has been employed by GEICO for 17 years (Exhibit M, Debra Beasley Depo. Excerpts, page 4, lines 7-24).

315.    Ms. Beasley was trained at GEICO using the GEICO claims manual (Exhibit M, Beasley, page 5, lines 3-6).

316.    Ms. Beasley took over the Hoyt claim file on July 30 or July 31, 2012, from Ms. Jahnke (Exhibit M, Beasley, page 6, lines 14-17).

317.    At the time the Hoyt claim file was assigned to Ms. Beasley, the judgment entered in March of 2009 by the District Court of Wyandotte County, Kansas in *Kannaday v. Ball*, Case No. 06-CV-497, was being cross-appealed to the Supreme Court of Kansas (Exhibit M, Beasley, page 18, lines 22-24).

318.    The cross-appeal was made on Mr. Ball's behalf (Exhibit M, Beasley, page 19, line 14 – page 20, line 1).

319.    Ms. Beasley has never communicated with Mr. Ball and she has never attempted to communicate with Mr. Ball (she is still the claims handler on this claim) (Exhibit M, Beasley, page 21, lines 15-20, page 32, lines 9-21).

320.   Ms. Beasley did not tell Mr. Ball that GEICO was taking an appeal on his behalf (Exhibit M, Beasley, page 22, lines 5-7).

321.   GEICO made the decision to dismiss Mr. Ball's cross-appeal (Exhibit M, Beasley, page 22, lines 8-10).

322.   Ms. Beasley has no idea whether Mr. Townsley consulted with Mr. Ball or advised Mr. Ball about the appeal (Exhibit M, Beasley, page 24, lines 14-23).

323.   GEICO made the decision to abandon the appeal, taken on Mr. Ball's behalf, and Ms. Beasley testified that she never consulted Mr. Ball about abandoning the appeal and she does not know whether anyone else at GEICO consulted Mr. Ball about abandoning the appeal (Exhibit M, Beasley, page 24, line 24 – page 25, line 5).

324.   Ms. Beasley, at the time of her deposition, was not sure whether she even knew how to reach Mr. Ball, at the time the Hoyt file was delivered to her for handling (Exhibit M, Beasley, page 25, lines 19-25).

325.   Ms. Beasley testified that her obligation in handling the claim is not any different where the insured is *not* in a position to pay the judgment than if the insured *was* in a position to pay the judgment (Exhibit M, Beasley, page 28, lines 21-24).

326.   Ms. Beasley had an obligation to communicate with the insured, even where he was not in a position to pay any judgment entered against him (Exhibit M, Beasley, page 28, line 21 – page 29, line 6).

327.   Ms. Beasley testified she does not know why the first appeal was taken from the initial judgment entered by the District Court of Wyandotte County, Case No. 06-CV-497, claiming the settlement release entered by Mr. Ball and plaintiff Kannaday was invalid, where

GEICO's approach was that the Estate had no assets and it did not matter what the judgment was (Exhibit M, Beasley, page 42, lines 7-15).

328. After remand, GEICO defended the Hoyt Estate in the action of *Kannaday v. Ball*, Case No. 06-CV-407 (District Court of Wyandotte County, Kansas) (Exhibit O, District Court of Wyandotte County's Case Display post-remand including identification of counsel for the parties, Hearing list and Registry of Actions).

329. The insurance policy issued to Stephanie Hoyt by GEICO contains the following promise:

> SECTION I – LIABILITY COVERAGES …
>
> 14. *"You"* means the policyholder named in the declarations …
>
> LOSSES WE WIL PAY FOR *YOU* UNDER SECTION I
>
> > Under Section I, we will pay damages which an *insured* becomes legally obligated to pay because of:
> >
> > > 1. *bodily injury*, sustained by a person …
>
> ADDITIONAL PAYMENT WE WILL MAKE UNDER THE LIABILITY COVERAGES …
>
> > 2. All court costs charged to an *insured* in a covered lawsuit.
> >
> > 3. All interest accruing on that amount of a judgment which represents our limit of liability until we have paid, offered or deposited in court that part of the judgment not exceeding the limit of our liability …

(Exhibit R, GEICO/Hoyt policy excerpts, policy no. 4034676470 (Pretrial Order, Stipulations at ¶ 4(b)(1)), pp. 4-5).

330. The policy issued to Stephanie Hoyt by GEICO contains the following promise:

> SECTION I – LIABILITY COVERAGES …
>
> LOSSES WE WILL PAY FOR *YOU* UNDER SECTION I

> Under Section I, we will pay damages which an insured becomes legally obligated to pay because of...bodily injury, sustained by a person ...

LIMITS OF LIABILITY

> 1.    The limit of bodily injury liability stated in the declarations as applicable to 'each person' is the limit of our liability for all damages...because of *bodily injury* sustained by one person ...

> 2.    The limit of such liability stated in the declarations as applicable to 'each occurrence' is, subject to the above provision respecting each person, the total to limit of our liability for all such damages...because of *bodily injury* sustained by two or more persons as the result of any one occurrence ...

(Exhibit R, policy, pp. 4, 6).

## ARGUMENTS AND AUTHORITIES

### FIRST ISSUE: THE JUDGMENT RULE

A.    APPLICATION OF THE JUDGMENT RULE

*Interpled Funds:*

GEICO confuses its duty when it discusses the funds deposited with the Court in connection with the interpleader. Its duty was never to benefit plaintiff Kannaday. Its duty to exercise good faith is owed to the insured. *Bollinger v. Nuss*, 202 Kan. 326, 341, 449 P.2d 502 (1969)). " '...While the insurance company, in determining whether to accept or reject an offer of compromise, may properly give consideration so its own interests, it must, in good faith, give at least equal consideration to the interests of the insured and if it fails so to do it acts in bad faith.' " *Id.* at 336-37.   GEICO could have paid Kannaday the $25,000 in response to her demand for the $25,000 *and* obtained a release through that settlement with plaintiff. Instead, GEICO filed the interpleader which was not even an *attempt* to protect the insured. It actually chose not to go the route that would have provided it with a release ·and instead file an interpleader which did not protect its insured from judgment.

*Judge Lungstrum's Decision*:

Respectfully, the Court is not bound by or controlled by Judge Lungstrum's opinion in the prior garnishment action, Case No. 09-CV-2255-JWL. That case was dismissed due to lack of jurisdiction because the Kansas Supreme Court denied the Petition for Review and remanded the matter back to the District Court of Wyandotte County, Kansas for trial (Pretrial Order, Stipulations at ¶ 4(a)(9)-(11)). There was never a final judgment in GEICO's or plaintiff's favor (Exhibit Q, Order granting motion to dismiss, garnishment proceeding, 09-CV-2255-JWL). The law that binds this Court is set forth within *Farmers Ins. Exchange v. Schropp*, 222 Kan. 612, 619-20, 567 P.2d 1359 (1977).

It should also be noted that Judge Lungstrum denied plaintiff's motion for summary judgment on the merits of the "bad faith/negligence claim", but did not grant GEICO's motion for summary judgment. *Kannaday v. Ball*, No. 09-2255-JWL, 2010 WL 2346368 (D. Kan. June 9, 2010). According to Judge Lungstrum, "Geico's conduct with respect to settlement presents a question of fact for trial." *Id*. at *6 (citing *Bollinger*, 202 Kan. at 341).

GEICO relies on dicta from Judge Lungstrum's opinion regarding what might have been considered by the Court if the Kansas Court of Appeals decision had come down before Judge Lungstrum ruled the opposing motions for summary judgment. That's certainly not persuasive as to the current issue before the Court – the application of the judgment rule to the facts of this case. Judge Lungstrum never determined that an appellate decision that the nonclaim statute limited estate asset liability to six months would be sufficient to grant summary judgment to GEICO, in the garnishment action, as a matter of law. *Id*. at *7. "[D]espite its protestations, Geico has not shown that the non-claim defense is so strong in this case as to be considered a sure winner." *Id*. at *8.

60

> Similarly, the lack of any assets in the estate in this case ... does not automatically bar plaintiff's claim. As Geico concedes, Kansas has rejected the pre-payment rule, which makes actual payment of the excess judgment a condition precedent to a bad faith claim; Kansas has instead adopted the judgment rule, which allows the insured to maintain such a claim even while insolvent. *See Farmers Ins. Exch. v. Schropp,* 222 Kan. 612, 622–24, 567 P.2d 1359, 1368–69 (1977). Thus, an insurer still has a duty to defend and to act reasonably and in good faith, even if the insured is insolvent or otherwise judgment-proof, including in instances where the insured has entered into a covenant with the claimant prohibiting execution against the insured. *See Glenn v. Fleming,* 247 Kan. 296, 316–17, 799 P.2d 79, 91–92 (1990). The insurer can be held liable for an excess judgment on a bad faith claim even if the insured has no assets.

*Id.* at *9. The law in Kansas as to this issue is controlled by *Schropp.*

### *Farmers Ins. Exchange v. Schropp*

GEICO's argument is that the bad faith claim should be dismissed because the Kannaday claim never created a situation where Estate would have to pay the excess judgment.

The Kansas Supreme Court has specifically held it does not matter whether an estate was bankrupt or insolvent and the Court has specifically held that the insolvency of an estate is irrelevant. *Schropp,* 222 Kan. at 623-624.

From the applicable Kansas case law we know that whether the insured does or does not have assets is not a consideration in whether a duty was owed or breached. That only makes sense. Few insureds have sufficient assets such that the insured could pay a large judgment. After all, that is the reason individuals purchase insurance. The duty of due care and good faith owed by the insurance company is owed to the insured regardless of the wealth of the insured. That is sound public policy. Again, the Kansas Supreme Court recognized such public policy in *Glenn v. Fleming*, 247 Kan. 296, 316-17, 799 P.2d 79 (1990):

> We have previously considered and rejected an insurer's contention that a bad faith or negligence claim for failure to settle within the policy limits could not be asserted against the insurer when the insured was insolvent. *Farmers Ins. Exchange v. Schropp*, 222 Kan. 612, 567 P.2d 1359 (1977). In that case, the insurer reasoned that an insolvent insured could not be harmed by an entry of an excess judgment since the insured has no assets

with which to pay the judgment. This Court moved forward to protect the rights of the insured by adopting the "judgment rule" and rejecting the "prepayment rule".

The "prepayment rule" requires that payment of the excess judgment is a condition precedent to an action against the liability carrier for the excess liability. The "judgment rule" does not require payment. Farmers contended that it was not obligated to exercise good faith in order to settle damage claims within the policy limits when the insured is bankrupt, insolvent, *or otherwise judgment proof.* 222 Kan. at 623, 567 P.2d 1359. We held the prepayment rule did not serve the ends of justice ...

The Kansas Supreme Court recognized that public policy would not allow for an insurance company to avoid an obligation of good faith and reasonable care just because the insured had no money. The insolvent insured needs insurance more than anyone else.

The Kansas Supreme Court stated:

Farmers ... contends that it is not obligated to exercise good faith in order to settle damage claims within the policy limits when its insured is bankrupt, insolvent, or otherwise judgment proof; and that an **insolvent estate, such as that of Sohl,** like an insolvent insured, cannot be harmed by the entry of an excess judgment against it, since it has no assets with which to pay the judgment.

The Supreme Court of Texas in Hernandez v. Great American Ins. Co. of N. Y., 464 S.W.2d 91 (Tex.1971), abandoned the prepayment rule and adopted the judgment rule for that state. The court observed that the traditional rule of strict indemnity requires the indemnitor to reimburse only actual loss and not to discharge the liability of the indemnitee; however, the court concluded that the prepayment rule was inconsistent with the law of tort liability, where the injured party is entitled to recover, as near as possible, compensation for the damages he suffers. The court observed that virtually everything that has been written on this subject in the past fifteen years has favored the judgment rule over the prepayment rule.

We find the following in 7 Am.Jur.2d Automobile Insurance s 158, pp. 490-491:

". . . (I)t is now generally held, although there is some authority to the contrary, that an action against the insurance company will lie regardless of whether or not the insured has paid or can pay the portion of the judgment in excess of the policy limits."

We do not think that the prepayment rule serves the ends of justice, and decline to adopt it. On the contrary, we see no reason why the insolvency of an insured or his estate should excuse the insurer from exercising the same good faith it would be expected to exercise, were the insured fully financially responsible. Further, an insured need not wait until his property is seized under an excess judgment before commencing action against

62

an insurer whom the insured claims has acted negligently or in bad faith in failing to settle a claim within the policy limits. **The action lies, whether or not the insured has paid or can pay an excess judgment.**

*Schropp*, 222 Kan. at 623-24 (emphasis added).

The holding of *Schropp* is in line with the Kansas nonclaim statute, K.S.A. 59-2239. It is the law of Kansas that even after the nonclaim period set forth within the nonclaim statute has run, a claimant may pursue a claim against an estate as long as there will be no collection from the estate, above and beyond the insurance proceeds. According to K.S.A. 59-2239:

(1) All demands...against a decedent's estate...shall be forever barred from payment unless the demand is presented within the latter of...four months from the date of first publication of notice...or...if the identity of the creditor is known or reasonably ascertainable, 30 days after actual notice was given...

(2) Nothing in this section shall affect or prevent the enforcement of a claim arising out of tort against the personal representative of a decedent within the period of the statutes of limitations provided for an action on such claim. For the purpose of enforcing such claims, the estate of the decedent may be opened or reopened, a special administrator appointed, and suit filed against the administrator within the period of the statute of limitations for such action. Any recovery by the claimant in such action shall not affect the distribution of the assets of the estate of the decedent unless a claim was filed in the District Court within the time allowed for filing claims against the estate . . . .

While a claimant proceeding on a claim under Paragraph 2 of the nonclaim statute cannot collect the judgment from the assets of the estate, the claimant most certainly can collect the judgment from the estate's liability insurance carrier because the liability policy is not a true asset of the insured's estate under the law in Kansas. *Nichols v. Marshall*, 491 F. 2d 177, 181-82 (10th Cir. 1974). The *Nichols* Court noted that monies recoverable under the terms of an automobile liability insurance policy do not have to be recovered in the deceased's insured's probate proceedings. *See id.* at 182. According to the *Nichols* Court:

In Kansas . . . an automobile liability insurance policy does constitute such an 'estate' of a nonresident insured decedent as to justify the issuance of letters of administration and the appointment of an administrator of such estate in Kansas probate proceedings. In re

Preston's Estate, 193 Kan. 145, 392 P.2d 922 (1964). However, such does not mean that monies recoverable under the terms of the automobile liability insurance policy must be recovered in the deceased insured's probate proceedings. In this regard, as was pointed out in Schloegl [an Illinois case], though the existence of an automobile liability insurance policy is sufficient to open an estate for a nonresident insured, it does not follow that the 'insurance policy was property of the decedent subject to ordinary administration.' Instead, said the court in Schloegl, such right to open an estate based on the existence of an automobile liability insurance policy issued to the deceased 'was bottomed on the concept that the insuring clause provided the personal representative with a chose in action with a situs in Illinois which would ripen against the insurance company in the event of a judgment against the administrator in the underlying personal injury action.'

*Id.* at 182-83.

According to the Tenth Circuit, Kansas recognizes the third party beneficiary aspects of liability insurance contracts. *Id.* at 183. In Kansas, an action does not abate when a defendant is discharged in bankruptcy where the defendant was insured against liability. *Id.* (citing *Johnson v. Bondurant*, 187 Kan. 637, 359 P. 2d 861 (1961)). "Under long standing garnishment law in Kansas, once judgment has entered, the judgment creditor then takes the place of the judgment debtor and may take that which the latter could enforce." *Id.* (citing *Burlington & M.R.R. Co. v. Thompson*, 31 Kan. 180, 1 P. 622 (1884)).

The factual scenario set forth in *Nichols* is essentially the same as the factual scenario presented to the Court in the instant case and to the Kansas Supreme Court in *Schropp*. If Ms. Hoyt had not died but, after the accident, filed for bankruptcy, Kannaday could have asked the Bankruptcy Court for relief from the bankruptcy stay, as long as Ms. Kannaday did not go after any personal assets of Ms. Hoyt. Ms. Hoyt would have been protected from *payment*, **the same as her Estate was protected under the nonclaim statute,** K.S.A. 59-2239. The bad faith claim would have remained, even if Ms. Hoyt had filed for bankruptcy. The duty owed by the insurance company is to avoid the judgment, regardless of the ability to *pay*. *Schropp*, 222 Kan.

at 623-24. That rule protects all insureds, regardless of their ability to pay. That is the public policy Kansas promotes.

The nonclaim statute simply provides that an estate does not have to *pay* a claim that was filed beyond the nonclaim period. K.S.A. 59-2239. The statute specifically provides that a civil action can be pursued against the personal representative during the statute of limitations. The action proceeds to judgment. A plaintiff in that case is barred from going after the assets of the estate to collect on the judgment. However, the plaintiff can certainly collect the judgment from the estate's liability insurance carrier. *Nichols*, 491 F.2d at 181-82.

GEICO'S own policy of insurance echoes Kansas law. GEICO's policy states, "Bankruptcy or insolvency of the *insured* or his estate will not relieve us of our obligations." (Plaintiff Garnishor's Motion for Partial Summary Judgment and Memorandum in Support (Doc. 65), Plaintiff's Statement of Uncontroverted Facts at ¶ 23 (quoting plaintiff's Exhibit 7, Excerpts from GEICO policy of insurance, ¶ 4, ACTION AGAINST US at p. 6)). The GEICO policy specifically states that the insolvency of the insured does not relieve GEICO of its obligations. *Id.* GEICO actually contracted with Ms. Hoyt that it made no difference whether she or her estate were insolvent. *Id.* GEICO's obligations to the insured were the same. *Id.* Again, GEICO's own claims handling manual repeatedly recognizes the conflict that exists between the insurer and the insured when a claim is asserted against an insured that is in excess of the liability limit and the manual advises its agents on how to meet the duty owed to the insured, in light of the existence of this conflict (Plaintiff Garnishor's Motion for Partial Summary Judgment and Memorandum in Support (Doc. 65), Plaintiff's Statement of Uncontroverted Facts at

¶¶ 13-22 (citing plaintiff's Exhibit 3, Excerpts from GEICO Claims Manual, at pp. 0019,

0022-0023, 0219, 0229-0230, 0233, 0238, 0327-0328, G-0010, G-0019-21)).

The concept that the insurance company owes the same duty of good faith and due care to

the insured, regardless of whether the insured is or is not an estate, or whether the insured is or is

not solvent, or whether the insured is or is not a solvent estate, is not novel. The duty arises from

the contract of insurance. The insurance company owes the same duty of due care and good faith

even if the insured is so well positioned that it has excess coverage or another layer of liability

protection. In *Estate of Louis Penn v. Amalgamated General Agencies*, 148 N.J. Super. 419, 372

A.2d 1124 (1977), the court noted that public policy in obtaining prompt and just settlement of

claims required that the court recognize the liability insurance carrier's obligation of good faith

and reasonable care to the insured even if the insured had excess liability coverage to pay a

claim. In *McNally v. Nation Wide Insurance Co.*, 815 F. 2d 254 (3rd Cir. 1987), the court held:

> [I]n deciding whether or not to pay money to a claimant, an insurance company may not conclude that a judgment-proof insured will not be harmed by a claimant's litigating to judgment against the insured. The insurer, these authorities instruct us, may not reason that, because the insured is judgment proof he will not suffer if a judgment is entered against him, on the theory that he will never pay it in any event.
>
> * * *
>
> In weighing the harm to insureds from rejection of a claimant's settlement offer, insurance companies therefore must attribute real significance to an adverse judgment against **even judgment proof insureds**.

*Id.* at 263 (emphasis added).

This Court considered a similar issue in *Aks v. Southgate Trust Company*, 844 F.Supp.

650 (D. Kan. 1994). The *Aks* Court noted that the insurance company's obligation to pay is not

triggered by payment of the obligation by the insured:

> Nowhere in the policy does it state that Federal will reimburse the insured only after a loss has been actually sustained or paid in satisfaction of a judgment. (citation omitted).

844 F.Supp. at 656.

This Court noted that what the liability insurance contract required was that the insured's obligation be finally determined by adjudication or written agreement. That is the same thing that is in the policy now before this Court. GEICO promised, "No suit will lie against us . . . until the amount of the *insured's* obligation to pay has been fully determined, either . . . by a final judgment against the insured after actual trial . . ." (Plaintiff Garnishor's Motion for Partial Summary Judgment and Memorandum in Support (Doc. 65), Plaintiff's Statement of Uncontroverted Facts at ¶ 24 (quoting Exhibit 7, Excerpts from policy at p. 5) (emphasis in original)).

This Court stated, in *Aks*:

> The issue thus becomes whether Southgate was or is legally obligated to pay anything. The court finds that once there was a settlement and a final judgment, Southgate became legally obligated to pay. Absent bad faith or fraud, a settlement is enforceable under the law as an agreement between parties. *Lewis v. Gilbert,* 14 Kan.App.2d 201, 202, 785 P.2d 1367, 1368 (1990). Obviously, a valid final judgment is also enforceable. Moreover, the policy issued to Southgate specifically contemplates that the insured can become legally obligated to pay both settlements and judgments and states that both types of obligations are covered.

*Id*. at 657.

It is well established in Kansas that the liability insurance company has a duty to protect the insured from judgment and whether the insured pays, can pay, or is required to pay the judgment is irrelevant. The damage is the judgment. We clearly have that here. The Hoyt Estate was damaged according to the Kansas Supreme Court. *Schropp*, 222 Kan. at 624. The controlling, binding Kansas law says the opposite of what GEICO is arguing. GEICO has not

offered the Court controlling, binding law, on point, that says the claim does not lie under these facts. This case is squarely within *Schropp*.

It is noteworthy that Mr. Ball filed an Estate Valuation affidavit revealing there were no assets in the Estate of Stephanie Hoyt. What difference does it make if the nonclaim statute applied or not? Either way, the parties are in the same position, there are no assets. The Kansas Supreme Court says it does not matter whether the insured pays, can pay or is required to pay. 222 Kan. at 624. It doesn't matter whether the insured is insolvent or doesn't have to pay because of the nonclaim statute or is otherwise judgment-proof. Good faith is owed, regardless. The action for bad faith lies, regardless. *Schropp*, 222 Kan. at 624.

GEICO relies on *West American Insurance Co. v. RLI Ins. Co.,* No. 07-0566, 2009 WL 3327203 (W. D. Mo. Oct. 8, 2009). That case involved a dispute between a primary insurer and excess insurer of the same named insured. *West American Insurance Co. v. RLI Ins. Co.,* No. 07-0566, 2009 W.L. 1912525, *1 (W.D. Mo. July 1, 2009). The insured, Miller, was involved in an automobile accident. He was insured by plaintiff West American. He maintained a personal umbrella policy with defendant and counter-plaintiff RLI. However, the existence of the RLI policy was not established until years after the accident. West American and the underlying plaintiffs went to arbitration, which resulted in a damage award in excess of West American's policy limits. *Id.* West American alleged that arbitration was conducted pursuant to a binding "high/low" agreement which specified that the "high" was capped at the limits of any applicable policies of insurance. West American paid the underlying plaintiffs up to its policy limits. *Id.* The underlying plaintiffs filed a garnishment action against the insured, West American and "unknown Insurance Companies" seeking to collect the unpaid portions of their judgments against the insured. *Id.*

RLI learned of the garnishment proceeding and the underlying claims and judgments against the insured. RLI intervened in that action. *Id.* at *2. West American sued RLI, Case No. 07-0566, alleging RLI caused or contributed to cause the filing of the garnishment action against West American and the insured, and also caused or contributed to cause the garnishment action to continue for over a year by not paying the underlying plaintiffs. *Id.* RLI counterclaimed against West American for bad faith failure to settle, contending West American refused to take advantage of the opportunities to settle within its primary policy limits.

The District Court for the Western District of Missouri found, it was a fact question whether West American protected the insured's assets with high/low agreement. If the jury found West American took steps to protect Miller's assets with the alleged high/low agreement, then West American could not be liable to RLI for bad faith.

GEICO relies on a case that is clearly distinguishable. The facts of *West American* are nothing like the facts of this case. Here, GEICO received an offer from passenger Gold to settle her claims for around $17,000 and provide the other 1/3 to passenger Kannaday and the other 1/3 to passenger Wright. GEICO rejected that offer. GEICO then offered Gold $25,000, more than she asked for. Gold accepted. Kannaday offered to settle her claims for $25,000. GEICO rejected that offer. Kannaday filed suit in excess of the policy limits. GEICO then deposited $25,000 into the registry of this Court and made it the basis of an interpleader action. GEICO did not attempt to make a high/low agreement, within the policy limits, with Kannaday. It could have done that, to protect its insured from an excess judgment, but it did not. It is the *judgment*, not the insured's ability to pay that gives rise to the bad faith claim.

Plaintiff agrees that if GEICO and plaintiff had entered a high/low agreement that capped recovery at the insurance policy limits, then a bad faith claim against GEICO would not lie. The

high/low agreement Western American obtained for its insured in the *Western American* case never exposed the insured to judgment in excess of the liability limits. The judgment would have never been for more than the limits pursuant to that agreement. GEICO did not do that for Mr. Ball, Special Administrator. The settlement agreement that Mr. Ball entered with plaintiff *did* protect the insured from judgment in excess of the liability limits. ***GEICO*** attacked that agreement on appeal, in the insured's name, without the insured's knowledge or permission, and got that agreement set aside. GEICO then again exposed the insured by going to trial and losing (on a clear liability case). This resulted in an excess judgment.

"The action lies, whether or not the insured has paid or ***can pay*** an excess judgment." *Schropp*, 222 Kan. at 624. The Kansas Supreme Court has told us, "[W]e see no reason why the insolvency of an insured or his estate should excuse the insurer from exercising the same good faith it would be expected to exercise, were the insured fully financially responsible." *Id.*

It should also be noted that it is clear from the plaintiff's statement of additional uncontroverted facts that the insured, Mr. Ball, Special Administrator, believes the Estate is still liable for the excess judgment. For that reason, Mr. Ball wanted to settle with plaintiff. GEICO's attorneys at Fleeson Gooing never even responded to the insured's contention on that issue. They dismissed his argument because it would not have benefited their other client, GEICO.

The Kansas Supreme Court in *Schropp* said says the bad faith action lies "whether or not the insured has paid or can pay an excess judgment." 247 Kan. at 624. The nonclaim statute does not take the parties out of that rule of law. The nonclaim statute means the state is immune *from payment.* That is covered by *Schropp.* The bad faith action lies, whether or not the insured has paid or can pay an excess judgment.

B.  RESERVATION OF RIGHTS - WAIVER

An insurance company cannot refuse to pay a judgment when it takes control of the defense of the claim against the insured and does not reserve its right to refuse to pay whatever judgment might be entered.

The policy issued to Stephanie Hoyt by GEICO contains the following promise:

> SECTION I – LIABILITY COVERAGES …
>
> LOSSES WE WILL PAY FOR *YOU* UNDER SECTION I
>
> Under Section I, we will pay damages which an insured becomes legally obligated to pay because of…bodily injury, sustained by a person …
>
> LIMITS OF LIABILITY
>
> 3.    The limit of bodily injury liability stated in the declarations as applicable to 'each person' is the limit of our liability for all damages…because of *bodily injury* sustained by one person …
>
> 4.    The limit of such liability stated in the declarations as applicable to 'each occurrence' is, subject to the above provision respecting each person, the total to limit of our liability for all such damages…because of *bodily injury* sustained by two or more persons as the result of any one occurrence …

(Exhibit R, policy, pp. 4, 6).

GEICO's position in this case is that it took control of the defense of the damage case by Ms. Kannaday against the Hoyt Estate under a liability policy, but never told the insured that even though it was controlling the defense, it would not pay whatever judgment might be entered in the case. In other words, the insurance company took control of the defense without reserving any rights whatsoever. That reservation of rights is important because it gives notice to the insured that the insured need not give up the right to control the insured's defense. The insured can refuse the defense, if the insurance company reserves its rights to decline to pay a judgment or any part of it. The insured can defend himself. The insurance company must give the insured

notice that the insurance company is willing to defend, but the insured is not required to accept that defense. The insurance company must give the insured notice of the reasons that the insurance company might not pay whatever judgment could be entered in the case. Without such a reservation of rights, the insurance company that takes control of the defense must pay whatever judgment is entered in the case. The insurance company has waived or is estopped from questioning the claim because it was beyond the terms of the policy.

The leading Kansas case on point is *Henry v. Johnson*, 191 Kan. 369, 381 P.2d 538 (1963):

> It is a well established rule that where an insurance company under a liability policy takes charge of the only defense which may then be imposed to an action on which liability rests…, it will be estopped from thereafter questioning the claim because it was beyond the terms of the policy or because of a breach of a noncoverage clause, unless it gives notice of its rights to set up the defense of noncoverage under an adequate and proper nonwaiver and reservation of rights notice to the insured." *Id.* at 376, citing *Brandon v. St. Paul Mercury Indemnity Company*, 132 Kan. 68; *Snedker v. Derby Oil Company Inc.*, 164 Kan. 640.

If the insurance company takes control of the defense, but desires to limit its obligation to pay whatever judgment might be entered, the insurance company must give notice through the reservation of rights:

> That rule is to be applied in accordance with general and well-established rules with respect to the construction of insurance policies and related papers pertaining to liability which may arise there under. One basic rule is that, since the company prepares the policy and its representatives, as here, prepare the related papers, thereby selecting the language employed, such policy and papers are to be construed strongly against the insurance company and in favor of the insured; that it is their duty to make the meaning clear, and if they fail to do so, the insurer and not the insured must suffer. <u>Stated another way, if the insurer desires to limit its liability, it should so state in clear and concise language in the policy or in the related papers involved.</u> (citing authority)" (emphasis added) 191 Kan. at 376.

GEICO took control of the only defense the Special Administrator of the Estate had to the Kannaday claim and did not reserve its rights in any respect. It is not sufficient for the insurance company to simply put something in the insurance policy. When the insured is the

defendant in a lawsuit, and the insurance company takes control of that lawsuit, the insurance company is liable for any judgment entered unless it sets forth its reservation of its right to decline to pay the judgment or any part of it so the insured can made an intelligent decision with regard to whether the insured does or does not accept the defense the insurance company is offering. When the insurance company provides a defense without any reservation whatsoever, it must pay the judgment.

This is not the only jurisdiction in which an insurance company cannot refuse to pay a judgment when it takes control of the defense of the claim against the insured and does not reserve its rights to refuse to pay whatever judgment might be entered. *See Kinnaman-Carson v. Westport Insurance Corporation*, 283 S.W.3d 761 (Mo. 2009).

## SECOND ISSUE: BREACH

A.   GEICO CANNOT SHOW PREJUDICE

GEICO argues it is entitled to summary judgment because the execution of the settlement agreement by Mr. Ball, Special Administrator of the Estate of Hoyt, breached Mr. Ball's duty to cooperate with GEICO in that the execution of the settlement agreement jeopardized GEICO's ability to defend the Kannaday lawsuit (GEICO's Memorandum in Support of Motion for Summary Judgment, Doc. 67 at p. 26).

GEICO's position does not make sense under Kansas law. In order to assert a breach of the policy, the insurance company must show the breach caused ***substantial prejudice to the insurer's ability to defend itself***. That is particularly true where the issue before the Court is a lack of cooperation issue. *Associated Wholesale Grocers, Inc. v. Americold Corp.*, 261 Kan. 806, 834, 934 P.2d 6 (1997). "Breach of a cooperation clause in a liability insurance policy does not by itself relieve an insurer of responsibility. The breach must cause ***substantial prejudice*** to

the insurer's ability to defend itself." *Boone v. Lowry*, 8 Kan.App.2d 293, 299, 657 P.2d 64

(1983) (citing *Jameson v. Farmers Mutual Automobile Ins. Co.*, 181 Kan. 120, 127, 309 P.2d

394 (1957); 8 Appleman, Insurance Law and Practice § 4773 (1981) (emphasis added). **"The**

**burden of proof to establish this policy defense is on the insurer."** *Id.* (citing Watson v.

Jones, 227 Kan. 862, 610 P.2d 619 (1980).

Here, there has been no prejudice to GEICO. GEICO *did* defend the Kannaday lawsuit.

Judge Boal entered a $4,723,368.60 judgment in favor of Rachel Kannaday and against the Hoyt

Estate in the District Court of Wyandotte County, Kansas on May 23, 2012, after a trial occurred

in which GEICO defended Mr. Ball, Special Administrator.    GEICO defended that suit.

Depositions were taken, experts were retained, testimony was presented to the Court by GEICO.

It is irrelevant that an ex parte judgment occurred prior to GEICO defending the tort case from

March 3, 2011, the date of remand, to November 26, 2012, the date the notice of removal was

filed in the Wyandotte County case. If GEICO's real concern is not being able to defend the

Hoyt Estate, something it was *never* concerned with before this summary judgment motion was

filed, that was cured after remand.    GEICO fully participated in that case and the trial of

plaintiff's claims.  The ex parte judgment entered by the District Court of Wyandotte County,

Kansas was *set aside*. GEICO has defended the tort claim of plaintiff.

GEICO's position has always been that the policy limits were paid out through the

settlement with passenger Gold and the interpleader.  GEICO has always maintained that it has

no coverage beyond the policy limit that was tapped out by way of the interpleader.  If that's

true, then how could there be any substantial prejudice to GEICO's ability to defend the

Kannaday lawsuit at the time the settlement agreement was entered, at the time the settlement

agreement had to be forwarded to plaintiff, or anytime after?  If GEICO owes nothing then what

74

prejudice is there to GEICO and its insured entering a settlement agreement with a tort plaintiff that protects the insured by obtaining a release for the Estate and the Estate's Special Administrator?   There was no prejudice to GEICO in Mr. Ball executing the settlement agreement with Kannaday.

GEICO's real argument is that the settlement agreement resulted in an *ex parte* judgment that Kannaday used to pursue a bad faith claim against GEICO. This argument again fails because the settlement agreement was set aside. GEICO defended the insured. The judgment of May 23, 2012, was entered after a trial in which GEICO fully participated and in which GEICO defended the insured. There has been no prejudice to GEICO. It got its way. Even if the settlement agreement hadn't been set aside, if GEICO had not been in bad faith, it wouldn't be prejudiced by an agreement between a tort plaintiff and an insured.   The assignment of a meritless bad faith claim is not prejudicial to GEICO. Even if the settlement agreement had not occurred, GEICO would've been in the same position. The tort claim would have gone to trial and judgment would have been entered in favor of plaintiff. Plaintiff would have asserted the bad faith claim in connection with a garnishment action. That is where the case is, procedurally, right now. There was no prejudicial interference with the defense of any claim by plaintiff.

The problem GEICO has is that it *did* act in bad faith and in doing so, it breached its duty, thereby relieving the insured Administrator of the Estate of his duty to perform under the policy.   Because GEICO acted in bad faith, plaintiff is entitled to garnish GEICO in the amount awarded plaintiff in the underlying tort case. GEICO may be in a precarious position, but that's a bed GEICO made for itself in the way it handled the claims against its insured.

GEICO also contends the settlement agreement was "unfair" to GEICO. Unfair because GEICO acted in bad faith? The settlement agreement provided the insured with what, according

to GEICO's own claims manual is of the utmost importance, a release. Obtaining a release was something GEICO refused to do for this insured. GEICO offered one claimant more money than she even asked for, ignored plaintiff's settlement demand for policy limits and then rejected it, held onto $12,500 for a passenger that hadn't even made a demand, and then filed the interpleader which did not protect the insured through a release. What the insured obtained through the settlement agreement was a release. This is something GEICO trains all of its claims handlers to fight for, on behalf of their insureds. How can that be "unfair" to GEICO? Why would GEICO not want the insured to have a release, if according to GEICO, it did not act in bad faith and it did not owe any money on any judgment entered against Mr. Ball as Special Administrator of the Estate? Even if the Court agrees with the Court of Appeals that the settlement agreement was void for lack of consideration, that does not mean that Mr. Ball entered it in bad faith or that it had a substantially prejudicial effect on GEICO. GEICO has combed through the files of Mr. Hasty and Mr. Ball and deposed both individuals. GEICO never found evidence of collusion or fraudulent conspiracy. There's no prejudice to GEICO. Procedurally, GeICO is right where it would have been regardless of the settlement agreement. The only thing that occurred to make GEICO "worse off" after the insured executed the settlement agreement is that the GEICO claims handlers abandoned all of their duties to the insured and focused solely on eliminating a bad faith claim, during the time when they owed duties to their insured and were duty bound to act in the insured's best interest. As the Court can see from the plaintiff's Additional Statement of Uncontroverted Facts, the most outrageous and egregious behavior on the part of GEICO occurred after the settlement agreement was executed by the insured. That is in direct violation of Kansas law. *Farmers Ins. Exchange v. Schropp*, 222 Kan. 612, 622-24, 567 P.2d 1359 (1977).

The *Roach* case relied on by GEICO does not stand for the proposition asserted. 326 F.Supp. 830 (1971).   The opinion states the settlement agreement was void for lack of consideration.  The opinion says nothing about a bad faith claim against an insurance company. The *Roach* opinion does not say that the insured's entry into such a settlement agreement absolves an insurance company of its bad faith or that it constitutes a breach by the insured that somehow absolves an insurance company of its own bad faith.  It certainly does not address the breach of duties by a liability insurer that we see in this case – the entertaining of a flagrant conflict of interest, no communication with the insured by the insurer, preceded by startling mishandling of settlement negotiations.

B.   GEICO'S BREACH

When the insurance company breaches the insurance contract, the insured is relieved of the obligation to perform under the policy. *First Hays Banshares, Inc. v. Kansas Sur. Co.*, 244 Kan. 576, 582-83, 769 P.2d 1184, 1189 (1989); *Youell v. Grimes*, 217 F.Supp.2d 1167, 1175 (D. Kan. 2002).  Further, once the insurance company has breached the insurance policy, the breach is irreparable. *Smith v. Blackwell*, 14 Kan.App.2d 158, 163-64, 791 P.2d 1343 (1990).  This is because "[i]f an insurer were permitted to 'cure' an earlier breach of a fiduciary duty, the policy of encouraging an insurer to exercise due care and attempt to settle claims in a fair and expeditious manner would be undermined." *Id.* at 164.

Here, GEICO breached the insurance policy, by failing to act in good faith and without negligence, long before the insured, the Estate, entered the settlement agreement with plaintiff. At the time the Estate, through its Special Administrator, Charles Ball, entered the settlement agreement, GEICO had already breached the agreement and that breach was irreparable.

Plaintiff has provided the Court with evidence that as of August 10, 2005, GEICO knew Wesley Medical Center's Notice of Hospital Lien as to Ms. Kannaday was for the amount of $158,929.49. GEICO determined, prior to November 5, 2005, that Ms. Hoyt was liable for causing the accident. Before January 19, 2006, the date of plaintiff's demand for limits, GEICO knew plaintiff had suffered a fractured pelvis, fractured vertebra, broken left arm, broken left hand, internal damage, and a spinal cord injury. GEICO knew that plaintiff was by far the most seriously injured of the three passengers in the Hoyt vehicle, involved in the accident.

GEICO made settlement valuations, not based on the relative injuries sustained by the three passengers or the relative exposure to the insured, but instead based on whether each of the claimants did or did not have their own underinsured motorist coverage. GEICO caims handlers deposed in this case testified that was not a proper factor to consider in making settlement valuations. In addition, the GEICO claims handler, Ms. Brantley, determined Kannaday had underinsured motorist coverage available to her. Plaintiff did not have underinsured motorist coverage available to her. Plaintiff's counsel told GEICO's counsel that. Counsel retained by GEICO never corrected GEICO with regard to the underinsured motorist issue. The GEICO claims handlers never revised GEICO's improper and incorrect settlement evaluations.

On October 5, 2005, counsel for passenger Gold proposed the $50,000 "per accident" limit of the policy be divided equally among the three passengers. GEICO never responded to that proposal from Gold's attorney, but later offered Gold $25,000. There was no justification in the file for GEICO offering Ms. Gold more than she had asked for. The GEICO claims handlers responsible for this claim file had never seen that happen before. GEICO received plaintiff's offer to settle for $25,000, dated January 19, 2006, but made no response to the letter. GEICO retained legal counsel after receiving plaintiff's demand and followed counsel's advice to

institute an interpleader instead of obtaining releases from the two individuals who were making a claim. GEICO twice offered plaintiff $12,500 to settle her claims, even though she was by far the most injured of the three passengers. Ms. Wright, at this time, hadn't made a claim for the other $12,500. She didn't even answer the interpleader. GEICO's legal counsel advised that GEICO should move quickly on the interpleader because if any of the claimants were to file suit or accept a settlement, "it would definitely complicate matters" *for GEICO.*

GEICO's counsel was clearly disappointed when Gold accepted the $25,000 offer and released the Hoyt Estate. Counsel wanted GEICO to "hurry up: and authorize the interpleader before his other client, the Hoyt Estate, was released by someone else. GEICO's position on the law was simply wrong. How GEICO ever came to the conclusion that there could be no claim against the Estate after the nonclaim period ran is still a mystery in this case. However, GEICO exposed the insured to the judgment that is now before this Court because it wanted to file an interpleader instead of taking a release. Even if passenger Gold had accepted the $25,000 before Kannaday made a claim, and there would only have been $25,000 left under the "per accident" limit, GEICO would still have been in bad faith in this case. Passenger Wright had never made a claim. After all, if Kannaday had accepted $12,500, and Ms. Wright never made a claim, GEICO would have saved $12,500. Good faith would have required that GEICO offer Kannaday an agreement that GEICO would pay the remainder of the $25,000 if Ms. Wright never made a claim. However, there was never any thought at GEICO, or with GEICO's counsel, that it ought to protect the insured by taking a release. The only thought that GEICO or counsel ever had was that an interpleader would protect GEICO in some fashion. When Ms. Gold indicated that Ms. Gold thought that splitting the $50,000 three ways made sense, the first reaction that GEICO and its counsel should have had was to make that proposal to Ms.

Kannaday and Ms. Wright, suggesting that all three claimants release the Hoyt Estate based on that apportionment of the policy limits or any other apportionment of the policy limits that the three claimants could agree upon. However, GEICO was not interested in such a good faith approach. It wanted to file an interpleader to help GEICO. GEICO just considers it "unfortunate" that the insured winds up with a judgment against the insured in excess of the policy limits.

After filing the interpleader complaint as counsel for GEICO, GEICO authorized Fleeson Gooing to represent the Special Administrator of the Hoyt Estate, Charles Ball, in the tort case filed by plaintiff after GEICO rejected plaintiff's request for the policy limits. From this moment and for years afterward, GEICO paid for the attorneys of Fleeson Gooing to represent the insured, where a claim in excess of the policy limits had been asserted against the insured, and GEICO, the liability insurer. GEICO allowed the attorneys of Fleeson Gooing to represent the insured where it became clear that the insured had a bad faith claim against GEICO, at the same time the same attorneys represented GEICO. According to the GEICO claims manual, that should have never happen and there was a clear conflict from the moment the excess demand was made. The claims manual tracks Kansas law in this regard. *Coleman v. Holecek*, 542 F.2d 532, 537 (10th Cir. (Kan.) 1976).

The Court can see that the goal of the GEICO claims handlers, the GEICO in-house counsel, and Fleeson Gooing was to protect GEICO from any excess exposure and to eliminate and extinguish the bad faith claim held by the insured. GEICO repeatedly breached its duty to protect the interests of the insured and to communicate with the insured. Mr. Ball never waived any conflict of interest for his lawyers in representing both him and in representing GEICO. GEICO never communicated with Mr. Ball about the conflict of interest.

Later, after Mr. Vix of Fleeson Gooing received the executed settlement agreement from Mr. Ball, he never called Mr. Ball. No one from GEICO called Mr. Ball. However, Mr. Vix and GEICO had a conversation about that executed settlement agreement. In violation of the rules set forth within the GEICO claims manual, the GEICO claims handler who spoke to Mr. Vix about the settlement agreement did not record/describe that conversation in the claims log. This was highly unusual. After that conversation, Mr. Vix kept the settlement agreement. He did not call Mr. Ball about the settlement agreement. He did not forward the agreement to plaintiff's counsel. He did not tell plaintiff's counsel that the agreement had been executed and that he was refusing to turn it over to plaintiff. He did not tell Mr. Ball that he was refusing to forward the settlement agreement out of his office. That settlement agreement was not provided to plaintiff until 2008 when she had to obtain it by way of a request for production.

By the time Mr. Ball executed the settlement agreement, GEICO had repeatedly breached the insurance contract. GEICO had repeatedly breached fiduciary duties owed to the insured. The settlement negotiations were handled in such a way that it is clear GEICO was not protecting the insured. GEICO was protecting GEICO.

After the settlement agreement was executed, GEICO did not even attempt to protect the insured's interests or act in the best interests of the insured. GEICO filed an appeal in the insured's name, without notifying him or obtaining his permission to attack the settlement agreement on appeal and have it set aside. This was after Mr. Ball had told his attorney at Fleeson Gooing that he wanted the case settled and he thought a settlement with plaintiff would be the best protection for the Estate and the Special Administrator because, through the settlement, the insured would obtain a release from plaintiff. The attorneys retained by GEICO ignored Mr. Ball. They did what GEICO wanted. A cross-appeal was filed, in Mr. Ball's name.

GEICO did not communicate with Mr. Ball or inform Mr. Ball about this cross-appeal. It was later abandoned. GEICO did not communicate with Mr. Ball about the abandonment of the cross-appeal.

In addition, Ms. Jahnke took outrageous actions against the insured despite the fact that she was the examiner on the claim file responsible for *protecting* the interests of the insured. She tried to get Mr. Ball removed as the Special Administrator. She did not communicate with Mr. Ball at all during her time as the examiner on this file. She signed a petition that was filed in a Kansas probate court, in the name of GEICO, *against the insured*. When the Kansas probate court ordered Ms. Jahnke to appear for a deposition in Kansas, at the expense of GEICO, and ordered GEICO pay a Special Master, that claim filed by the insurance company, signed by the GEICO unit examiner, against the insured, was dismissed. The claims examiner hired a Kansas City attorney to look for a reason to disqualify GEICO's insured, Mr. Ball, from being the Special Administrator of the Estate. During her deposition, Ms. Jahnke could not come up with any reason for her belief that throughout her handling of this file, she was protecting the interests of GEICO and the insured. She could not explain how she could have believed the interests of GEICO and the insured were one and the same where an excess policy limit demand had been made by plaintiff, and the insured had a bad faith claim against GEICO. Ms. Jahnke could not explain how she could have believed that the interests of the insured and GEICO were *not* in conflict with one another.

By law, the interests of the insured and the insurance company were in opposition when Ms. Kannaday filed her lawsuit seeking a claim in excess of the limits. That occurred in March of 2006. In addition, the claims handlers at GEICO recognized that a bad faith claim belonged to

82

the insured. The interests of the insured and GEICO clearly and fundamentally conflicted with each other.

GEICO repeatedly breached fiduciary duties owed to its insured, Charles Ball, Special Administrator of the Hoyt Estate. The insured was relieved of any obligation to perform under this policy long before the insured made the decision to enter the settlement agreement in order to benefit the insured by obtaining a release. Even if the entering of that settlement agreement was a breach by the insured, which plaintiff denies, GEICO irreparably breached the insurance policy, repeatedly, long before the execution of the settlement agreement.

Mr. Ball did not "assist" plaintiff's counsel and despite the taking of two depositions of Mr. Hasty, despite GEICO's counsel cross-examining its own insured/client in December of 2007 and again deposing him in September of 2009, accessing Mr. Ball's file on this claim and Mr. Hasty's file on this claim, GEICO has never turned up any evidence that Mr. Ball was assisting Mr. Hasty in any way. The execution of a settlement agreement, by the insured, that *benefits* the insured by obtaining a release for the insured Estate and the Special Administrator of the Estate is not assisting the plaintiff's counsel as contemplated by the cases relied on by GEICO. The insured disagreed with his attorneys retained by GEICO. He felt it was in the best interests of the Estate and the Special Administrator to have the case settled per the terms of the plaintiff's proposed settlement agreement. Disagreeing with an attorney retained by GEICO on settlement matters is not "assisting" the plaintiff's counsel. There is no evidence that Mr. Ball colluded with or fraudulently conspired with an adverse party. Mr. Ball, the insured, wanted the case against him, as the Special Administrator of the Estate, settled. Ins uch a way that he and the Estate were released and the Estate was protected  He simply disagreed with the attorneys retained by GEICO as to the law. They ignored him and did what they wanted, including

83

burying an executed settlement agreement in their legal file. GEICO completely ignored the insured. No one from GEICO even spoke to Mr. Ball about the Hoyt claim. Not one of the cases relied on by GEICO tells the Court that Mr. Ball was assisting plaintiff's counsel under the facts of this case. GEICO does not tell the Court how anything Mr. Ball did as the Special Administrator could be considered collusion or a fraudulent conspiracy.

### COURT COSTS AND INTEREST

The Court may not enter summary judgment in favor of GEICO because the GEICO policy required GEICO to pay court costs assessed against an insured in any case in which GEICO provided a defense (Exhibit R, policy, pp. 4-5). GEICO defended Mr. Ball, Special Administrator for the Estate of Hoyt in the tort suit filed by plaintiff Kannaday in the District Court of Wyandotte County, Kansas, Case No. 06-CV-497. It owes the court costs assessed against it in the case numbered 06-CV-497 (Exhibit S, Journal Entry, Case No. 04-CV-497). Under its policy, GEICO promised to pay interest on the court costs until the costs are paid. Because GEICO has never paid the court costs, it still owes the court costs and it owes interest on the court costs (Exhibit R, GEICO/Hoyt policy, page 5). Because GEICO has never paid the court costs or the accrued interest, it cannot be entitled to summary judgment. It is not entitled to judgment as a matter of law where it has not paid the court costs and interest owed on the costs.

### CONCLUSION

GEICO's request for summary judgment should be denied. Genuine issues of material fact exist as to plaintiff's bad faith claim against GEICO. GEICO is not entitled to judgment as a matter of law under the material facts of this case.

HASTY & ASSOCIATES, LLC

*/s/ Paul Hasty, Jr.*
Paul Hasty, Jr.        KS # 09132
7101 College Blvd., Suite 350
Overland Park, KS 66210
(913) 317-8068
(913) 317-8058 (facsimile)
phasty@hastyassoc.com

**ATTORNEYS FOR PLAINTIFF**

I hereby certify that the above and foregoing was electronically filed on the CM/ECF system and a copy was electronically sent to the following CM/ECF participants on the 25th day of October, 2013:

Lee Smithyman
Smithyman & Zakoura, Chtd.
750 Commerce Plaza II
7400 W. 110th Street
Overland Park, KS 66210

**ATTORNEYS FOR GARNISHEE**

*/s/ Paul Hasty, Jr.*
Paul Hasty, Jr.
For the Firm