IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

Rachel Kannaday,

        Plaintiff Garnishor,

        vs.

Charles Ball, Special Administrator of the      Case No. 12-2742-JTM
Estate of Stephanie Hoyt,

        Defendant,

        vs.

Geico Indemnity Insurance Company,

        Garnishee,

MEMORANDUM AND ORDER

On July 13, 2005, Stephanie Hoyt caused a motor vehicle accident which resulted in her death and serious injuries to her three passengers. At the time of the accident, Hoyt was insured by Geico Indemnity Insurance Company, under a policy which had minimal coverage: $25,000 per victim, and no more than $50,000 per accident. One of the passengers, plaintiff-garnishor Rachel Kannaday obtained a judgment against the Hoyt Estate, and now brings the present action against alleging that Geico acted negligently and in bad faith in refusing to settle her claims against the Estate.

The matter was tried to the court, which now enters the following findings of fact

and conclusions of law. The court finds that, while it was not free from honest errors of judgment, Geico acted in good faith and without negligence. Geico did not engage in any self-dealing, but sought to pay the full amount of its policy limits. The court finds that Geico's actions did not materially prejudice the Hoyt Estate – which had no assets other than the Geico policy and which in any event was protected by a statutory bar against any recovery.

As it did at the conclusion of the trial, the court again recognizes and salutes the courage and effort displayed by Rachel Kannaday as an individual in her progress in recovering from such serious injuries.


*Findings of Fact*

1. On July 13, 2005, Stephanie Hoyt attempted to make an improper u-turn on Interstate 35, and was struck broadside by a semi-truck owned by Chris Truck Line and driven by driven by Charles Church. Hoyt was killed instantly. Her three passengers – Genevie Gold, Sharon Wright, and Rachel Kannaday – were seriously injured.

2. Hoyt was insured by Geico. Its policy provided that Geico "will pay damages for which an insured becomes legally obligated to pay because of ... bodily injury." The policy further provided that "We [Geico] may investigate and settle any claim or suit." The policy provided such coverage limited to $25,000 per person, and a maximum of $50,000 per accident.

3. Hoyt was a college student at the time of the accident. Her estate had zero assets.

4. There is no evidence that the Hoyt's estate had even the slightest prospect of acquiring assets in the future.

5. The day of the accident, Geico claims adjuster Kwirt Roarick sent a fax to Custard Insurance Adjusters, requesting the Kansas Highway Patrol report and photographs.

6. Geico's activity log addressing various events arising from the Hoyt policy ultimately included some 1,900 entries by April 8, 2009.

7. Between July 14, 2005 and September 27, 2005, Geico claims adjusters attempted to call or spoke with Hoyt's father, Lanny Hamp, on over a dozen occasions. The most important occurred on February 27, 2006, at 4:46p.m., when Geico adjuster Sabrina Brantley told Hamp that attorney Lyndon Vix, of the law firm of Fleeson, Gooing, Coulson & Kitch had just informed her any assets of Hoyt's were protected under the Kansas Non-Claim Statute, because no Estate had been set up within six months of her death.

8. On July 26, 2005, Geico investigator Jim Hill learned that Sharon Wright was in Wesley Medical Center with serious injuries.  On July 28, 2005, Geico took a recorded statement from Wright. Wright had sustained a fractured left rib, a fractured chest bone, and a fractured pelvis. Wright also suffered a concussion, required removal of her spleen (due to excessive bleeding), and remained confined to a wheelchair. For almost one month after the accident, Wright could not roll over in bed.

9. On August 5, 2005, Geico learned that Gold had serious injuries, which included a ruptured spleen, left eye nerve damage, right lung collapse, left side weakness (causing

3

walking difficulties), speech difficulties requiring therapy, and psychological issues also requiring therapy. At that time, she was going to physical therapy Monday through Friday, from 9:00 a.m. to 4:00 p.m.

10. On August 8, 2005, Geico learned that Kannaday suffered a fractured pelvis, fractured vertebra, broken left arm, broken left hand, internal damage and, most critically, a spinal cord injury. Kannaday's injuries would prove much more severe than those of Gold or Wright.

11. Between August and November of 2005, Geico obtained and reviewed the medical records of the three passengers. By August 16, 2005, Geico knew that Kannaday's initial hospital bill alone would exceed $140,000.

12. On August 4, 2005, Custard Insurance Adjusters forwarded Kwirt Roarick the just completed Kansas Highway Patrol report, which presented the first credible evidence of Hoyt's fault in the accident.

13. On August 8, 2005, Jim Hill of Geico learned that Kannaday was insured by a MetLife automobile policy, and that Wright was insured by a Geico policy issued to her mother.

14. On August 10, 2005, Keith Richey, attorney for Wesley Medical Center, forwarded to Geico notice of Wesley Medical Center's hospital liens regarding its services for Kannaday ($158,929.49) and Wright ($95,499.26).

15. On August 11, 2005, Roarick called Hamp to tell him that the accident liability would far surpass policy limits. Since his call was not answered and no voice mail was

4

available, Roarick also sent Hamp a letter advising of the insufficient policy limits. The same day, Roarick called Wright and told her of the minimal liability limits. He recommended that Wright place her insurance carrier (also Geico) on notice of a possible UIM claim. Roarick made two telephone calls to Kannaday's voice mail, again stating the policy limits and stating that Kannaday should inform her insurance carrier.

16. On August 23, 2005, Geico paid Kannaday's complete PIP medical benefits of $4,500.

17. On August 31, 2005, Geico paid the Hoyt policy's $2,000 death benefit to Hamp, who had already paid Chapel Hill Butler Funeral Home.

18. On September 1, 2005, without prompting, Hill discussed an agreement with Wesley Medical Center, whereby Geico would pay $4,500 to Wesley Medical Center as secondary PIP benefits for Wright, and Wesley would recover remaining proceeds from a state charitable agency, rather than from Wright or her parents.

19. On September 14, 2005, Gold's attorney, Doug Greenwald, submitted a demand letter on behalf of Genevie Gold to Kwirt Roarick, noting that Gold sustained severe injuries which included traumatic brain injury.

20. Roarick called Kannaday on September 27, 2005, within one week of her release from Wesley, telling her that he would be making settlement offers after he received complete medical records for all injured parties.

21. Also on September 27, Greenwald called Roarick. He stated that Gold had no available automobile insurance coverage, and thus no UIM coverage. Roarick took this

information into consideration when deciding to offer policy limits of $25,000 to Gold on November 4, 2005.

22. Greenwald told Geico on October 5, 2005 that Wesley had a lien of $44,200.27 for Gold's treatment. Greenwald proposed dividing the $50,000 maximum equally among the three passengers.

23. Kannaday was the most seriously injured of the passengers. By October, 7, 2005, the Geico claim file indicated that Gold's hospital bill was less than $50,000; Wright's bill less than $100,00. Kannaday's bill was then around $160,000.

24. By October 10, 2005, Geico had paid and exhausted PIP medical and rehabilitation benefits for Gold and Wright. Geico had paid and exhausted Kannaday's PIP medical benefits, but had not yet received her rehabilitation bills.

25. By October 14, 2005, Geico had paid and exhausted medical ($4,500) and rehabilitation ($4,500) PIP benefits for Gold, Wright, and Kannaday.

26. On October 22, 2005, Michelle Sherman forwarded to Geico a subrogation notice concerning property damage and injuries to Charles Church and the Chris Truck Line truck. This was followed by Liberty Mutual's subrogation notice of October 31, 2005.

27. On October 25, 2005, Roarick asked Gold for additional medical authorizations, and told Greenwald that he would evaluate how to disburse the policy limits after the had the complete medical records..

28. On November 4, 2005, Roarick received approval authority to pay the $50,000 per occurrence policy limits for global settlement with all three passengers. The same day,

he made offers of $25,000 to settle the claim of Genevie Gold, $12,500 to settle the claim of Sharon Wright, and $12,500 to settle the claim of Rachel Kannaday. At that time, only Gold had made a demand and only Gold was represented by an attorney.

29. Roarick made the November 4, 2005 offer in the belief that Kannaday would have supplemental UIM benefits from her mother's MetLife policy, and Wright would have supplemental UIM benefits from her mother's Geico policy. He believed that each passenger would thus receive $25,000 through the combination of Geico's liability policy and the UIM coverage.

30. Roarick's conclusion was erroneous. While Roarick's analysis would have been accurate in most states, K.S.A. 40-284(b) mandates a "limits-to-limits" policy comparison for UIM motorist benefits, and denies UIM coverage where the underinsured tortfeasors' policy limits are equal to or more than the claimant's limits. *See O'Donoghue v. Farm Bureau Mut. Insurance*, 275 Kan. 430, 66 P.3d 822 (2003); *Halsey v. Farm Bureau*, 275 Kan. 129, 61 P.2d 691 (2003). The only UIM coverage available to Kannaday was a policy which had the same limits as the Geico liability policy issued to Hoyt.

31. Consistent with this mistaken understanding, Geico paid $25,000 in UIM benefits to Wright under her mother's policy, after the Hoyt policy liability benefits were exhausted in the federal court interpleader.

32. Geico policy is to pay claims as promptly as possible. Where coverage and liability are clear, its policy is to try and settle the case promptly.

33. As a result, the actual contributions received by the passengers resembled

7

Roarick's original intention of benefitting the passengers equally — (a) Gold (through her attorney Greenwald) accepted the November 1, 2006; (b) $25,000 in UIM benefits were given to Wright; and (c) Kannaday's obligations to Wesley Medical Center by $25,000, as adjudicated by the initial federal action.

34. After receiving no response to the settlement offer from Kannaday, Geico repeated its $12,500 offer on December 1 , 2005 by written offer. The same day, Geico claims adjuster Sabrina Brantley (who took over the case from Roarick) telephoned Kannaday's mother, Robin Kannaday. Brantley said she would investigate the possibility of Wesley Medical Center waiving its lien in relation to Rachel Kannaday.

35. By December 9, Geico negotiated a lien resolution , under which Wesley agreed to accept $6,250 of the $12,500 Wright settlement on its hospital lien of $89,249.26, and $6,250 of the $12,500 Kannaday settlement on its hospital lien of $152,679.49.

36. On December 20, Brantley forwarded written settlement offers of $12,500 to Wright and Kannaday, which incorporated the Wesley hospital lien concession.

37. On December 28, Jim Hill wrote to ask Kannaday to contact her Waffle House supervisor to complete lost wage forms, preliminary to receiving PIP lost wage benefits.

38. Beginning on January 14, 2006, the Kansas Non-Claim Statute (K.S.A. 59- 2239) jurisdictionally barred the enforcement of claims against the estate assets of Stephanie Hoyt, because six months had passed since her death. *Kannaday v. Ball*, 44 Kan. App. 2d 65, Syl. ¶ 2, 234 P.3d 826 (2011 ).

39. On January 19, 2006, attorney Paul Hasty sent Kannaday's first demand letter by

certified mail , offering to settle her claim for $25,000, stressing that "Kannaday was, by far, the most seriously injured passenger."

40. At the time of this demand, Hasty had been retained for only a few days, and did not have the medical records of his client. He also did not have the records of Gold or Wright.

41. Geico received Hasty's demand letter on January 23, 2006. The next day Geico supervisor John Horton wrote and called attorney Lyndon Vix of the law firm Fleeson, Gooing, Coulson & Kitch. Horton summarized the claims against the Hoyt Estate, and instructed Vix to negotiate settlements that would distribute the policy's per occurrence limits of $50,000 in bodily injury proceeds. He asked Vix to respond to Hasty's $25,000 demand.

42. Vix recognized that Geico's agents had mistakenly assessed the application of UIM coverage available to the three passengers. However, he also recognized that Geico had made a binding offer to Gold, based on that mistake.

43. On January 19, Vix emailed Horton recommending that the policy limits of $50,000 be interpled into court. The interpled funds would be distributed between Gold, Wright, and Kannaday, subject to medical and hospital liens..

42. On February 1, 2006, Geico decided to follow Vix's advice. On February 15, 2006, Hill called Hasty's office to encourage him to complete and return Kannaday's lost wage application.

43. Hasty returned the call to indicate it had been completed. However, Geico never

received a completed lost wage application.

44. The same day, Hasty did send a letter to Geico (received on February 23), requesting a myriad of PIP benefits, the bulk of which had been paid to Kannaday in early October 2005. Hill responded by letter indicating the maximum PIP wage benefit of $10,800 ($900 per month for one year), and that Geico had previously paid $4,500 in medical benefits, and $4,500 in rehabilitation benefits. Geico paid Kannaday's full lost wage benefit, although it never actually received Kannaday's lost wage application.

45. On February 21 , 2006, Brantley informed Vix that Gold (by her attorney Greenwald) had accepted the $25,000 offer. Geico ultimately paid $10,000 to Meridian Resource (a Blue Cross/Blue Shield entity) and the remaining $15,000 to Gold and her attorney.

46. As a result, Vix would only be able to interplead the remaining $25,000 under to policy.

47. On February 23,Vix wrote Hasty to repeat its prior $12,500 offer. The letter stated that Gold had already accepted the $25,000 offer, and that according the policy only provided a further $25,000 to split between Kannaday and Wright.  Vix stated that Wesley Medical Center would accept $6,250 of its hospital lien on the $12,500 offer to Ms. Kannaday. Vix sent a similar letter to Wright.

48. On Friday, February 24, 2006, Hasty faxed a response, repeating his demand of $25,000. On Saturday, February 25, Hasty executed a 50% contingency fee contract with Kannaday. On Monday, February 27, Hasty withdrew the demand, and told Vix that he

intended to file suit.

49. Hasty confirmed his withdrawal by letter sent via facsimile. He sent a second letter the following day, repeating the withdrawal.

50. Hasty's letters gave no reasons for the withdrawal. Nothing had changed in the interim, other than, on Saturday, February 25, Hasty having executed a contingency fee contract with Kannaday regarding the Hoyt Estate liability cause of action. Under this contract, Hasty would receive 50% of any amount recovered.

51. After learning of the interpleader action, Greenwald wrote to Vix to object the any interpleading of the full $50,000 policy limits, stating that he had already accepted Geico's offer of $25,000 on behalf of Gold. Vix agreed.

52. On March 17, 2006, Hasty filed a Petition for a Special Administrator for the Hoyt Estate. The Petition indicated that a Special Administrator was necessary to respond to Kannaday's tort claim against the Estate. The Petition requested the appointment of Charles Ball, a Wyandotte County attorney.

53. The same day, Hasty filed a lawsuit against the Hoyt Estate in Wyandotte County, alleging that Charles Ball was the Special Administrator. (Ex. 403, Kannaday-0001-2)n Hasty served Ball the same day, although Ball would not be appointed as Administrator until May 4, 2006, and thus could not accept service.

54. On March 23, 2006, Vix filed Geico's interpleader action in the United States District Court for the District of Kansas, reciting payment of $25,000 to Genevie Gold, and identifying the potential claimants as Wright, Kannaday, Wesley Medical Center, truck

driver Charles Church, Chris Truck Line, Liberty Mutual Fire Insurance (the workers compensation carrier for Chris), and Metropolitan Life Insurance Co. (Kannaday's PIP carrier).

55. On March 31, 2006, Geico tendered the remaining $25,000 of insurance coverage into the Registry of the Court. By April 17, 2006, all interpleader defendants had been served and Wesley Medical Center submitted an answer on May 1 0, 2006. Wright never answered the interpleader.

56. On April 21, 2006, Vix sent a letter to Ball announcing Fleeson's retention to defend the Estate in Kannaday's litigation. Vix further stated:  "We assume that your appointment is limited to receiving service and serving as the defendant in this case, and that you have no other knowledge or involvement in the affairs of the decedent. If this is incorrect, please advise."

57. Ball did not respond to the request.

58. On May 4, 2006, the state court appointed Ball as Special Administrator.

59. Between June 28, 2006 and April 12, 2012, Fleeson constantly attempted to keep Ball informed of the litigation. The firm sent Ball dozens of letters explaining developments in the case or providing copies of pleadings or other documents. Fleeson told Ball of its belief that the Estate's assets were fully protected by the non-claim statute, and its belief that the proceeds from Geico's policy should be interpled.

60. Ball responded only once to Fleeson's repeated attempts to contact him. On June 30, 2006, he sent Fleeson a copy of the Order appointing him Special Administrator, along

with signed discovery responses (which had been prepared by Fleeson). Ball never asked Fleeson any questions, and never responded to its subsequent inquiries or requests.

61. Ball failed to give Fleeson any reasonable explanation for his execution of the Settlement Agreement with Hasty, even though the Estate had at least a colorable defense under the non-claim statute.

62. From his actions and statements, Ball reasonably gave Fleeson the understanding that he simply was not interested in its actions regarding the interpleader and state court proceedings.

63. Ball appeared to consult with Hasty as counsel rather than Fleeson. He ignored dozens of communications from that firm, and when he received notice that Wright had filed suit against the Estate, he forwarded a copy of the complaint to Hasty. Concerned with Ball's actions, Geico moved in the state action to have him removed as sole Special Administrator, and have a co-Administrator appointed. The court denied the request.

64. On July 11, 2006, Charles Church's attorney sent notice to Geico that his client's claim would be addressed in the Interpleader action.

65. In August 2006, Hasty wrote to Vix demanding $500,000 on behalf of Ms. Kannaday. This settlement demand was communicated to Ball.

66. On August 30, 2006, Hasty forwarded a proposed Settlement Agreement through Vix to Ball, offering to protect the Estate (which had no assets), if Ball agreed to an *ex parte* hearing which would result in a judgment executable solely against Geico. Vix forwarded the proposal to Ball on September 7, 2006, and also wrote that he would soon be filing a

13

summary judgment based on the non-claim statute, thus ensuring that any recovery by against the Estate would be limited to the policy proceeds.

67. On September 20, 2006, Ball returned to Vix a signed copy of the Hasty settlement. Ball sent this copy without any cover letter or commentary. At the time, Ball knew that Geico had deposited the $25,000 remaining under the policy in the interpleader action. Fleeson sent further communications relating to the interpleader action and the non-claim statute. When Ball did not respond, either by telephone or by correspondence, Vix retained and did not forward the signed Settlement Agreement to Hasty.

68. On October 13, 2006, Vix forwarded to Ball Geico's Motion for Partial Summary Judgment based on the Kansas Non-Claim Statute.

69. On October 18, 2006, Vix wrote Ball memorializing the fact that Ball had unilaterally signed and returned the Settlement Agreement which would allow an *ex parte* judgment in return for a covenant not to execute, even though Ball knew about the pending summary judgment motion.

70. On October 23, 2006, Ball filed an Inventory and Valuation in Case No. 06P50 reflecting that the Estate of Hoyt had no assets. This Valuation was based solely on a letter Ball received from Hasty.

71. On November 7, 2006, the undersigned enjoined any of the interpleader defendants from attempting to recover the Geico insurance proceeds until the court rendered a decision regarding distribution.

72. On December 21, 2006, Judge Lampson issued a Memorandum Decision in the

state tort action, determining that no assets of the Estate of Hoyt could be garnished or executed upon to satisfy a potential judgment, pursuant to the non-claim statute. The court held that the non-claim statute protected the assets of the estate, and that Kannaday could only reach the Geico policy. Thus, the court allowed the matter to proceed solely with relation to the liability insurance coverage proceeds available to creditors of the Hoyt Estate.

73. On January 22, 2007, Lynn Preheim, outside counsel for Wesley Medical Center, emailed Hasty to indicate that Wesley would accept $6,000 in full satisfaction of Kannaday's $150,000 plus bill.

74. On July 12, 2007, Wright sued the Estate of Hoyt, Chris Truck Line, Daniel Church, and others, in *Wright v. Chris Truck Line*, Case No. 07CV1170 in the District Court of Wyandotte County, Kansas.

75. Ball received service of this suit and on July 30, 2007. Ball sent notice of the suit to Hasty, who sent the Petition to Vix, who filed a timely answer. On September 27, 2007, Geico moved to intervene, for purposes of tendering $25,000 UIM benefits under Wright's mother's automobile coverage.

76. On December 21, 2007, the court ordered that the interpled proceeds be paid by check to Wright and her attorney in the amount of $25,000. With this payment, the Gold settlement, and the interpleader deposit, Geico had expended $75,000 in insurance coverage. Geico made the payment in *Wright* despite Kansas law indicating was not obliged to do so, under the "limits-to-limits" analysis of K.S.A. 40-284(b). *O'Donoghue v.*

*Farm Bureau*, 275 Kan. 430, 66 P.3d 822 (2003); *Halsey v. Farm Bureau*, 275 Kan. 129, 61 P.3d 691 (2003).

77. On December 26,2007, Hasty conducted a deposition of Ball for the purpose of obtaining Ball's signature on a modified Settlement Agreement. Hasty asked Ball to sign a revised *ex parte* Settlement Agreement because the original agreement contained a typographical error, and the copy signed by Ball had not been forwarded to Hasty.

78. Ball signed the revised Agreement, even though only a few days before Judge Lampson had ruled that the non-claim statute protected all assets of the Estate except for the Geico policy. Further, he signed the agreement even though (a) Geico had fully paid Hoyt's policy limits ($25,000 to Gold and $25,000 to the interpleader), (b) Geico had also paid all available PIP benefits to Kannaday and the other passengers, and (c) Fleeson continued actively defending the state court actions by Kannaday and Wright.

79. On February 21, 2008, the undersigned awarded the interpled $25,000 to Wesley Medical Center for its hospital lien. The court noted that although Kannaday had not filed a brief supporting her claim to proceeds, Wesley would be entitled to the full amount anyway. *Geico v. Kannaday*, No. 06-01067-JTM (Dkt. 69). This determination benefitted Kannaday by reducing the amount of the debt owed to Wesley.

80. The Kansas Supreme Court has explicitly recognized, as one mechanism for an insurer faced with multiple claims in excess of policy limits, to "promptly and in good faith commence[] an interpleader action" *Farmers Ins. Exh. v. Schropp*, 222 Kan. 612, 621, 567 P.2d 1359 (1977) (citing *Club Exchange Corp. v. Searing*, 222 Kan. 659, 567 P.2d 1353 (1977). Geico

commenced the interpleader action promptly and in good faith in an attempt to fully pay out its maximum policy limits.

81. On March 28, 2008, in response to a request for production, Vix produced to Hasty a copy of the original Settlement Agreement.

82. The court conducted a telephonic scheduling conference in the *Kannaday* state court action on March 2, 2009. Hasty informed Judge Boal that there would definitely be no settlement, and that the matter would require a jury trial. The court then set a final Pretrial Conference for November 13, 2009, and a jury trial for December 7, 2009.

83. On March 18,2009, Hasty conducted an *ex parte* hearing before Judge Boal, in which Kannaday appeared in person and presented evidence of her damages. Neither Vix nor the Estate received notice of the hearing.

84. During the hearing, Hasty presented the court with the 2006 Settlement Agreement (the one with the typographical error). This agreement, which Ball had signed in 2006, was signed by Kannaday the day before the 2009 hearing. Hasty did not inform the court that (a) the Settlement Agreement had been obtained through a Request for Production, (b) the Estate and its attorney were not informed that Kannaday executed the document on the preceding day, (c) that the Estate and its attorney were given no notice of the hearing, and (d) a subsequent modified Settlement Agreement had been unilaterally executed by Ball during his deposition. Hasty only told the court that the agreement presented "was a negotiated agreement ... that allows the plaintiff to proceed *ex parte*." Following the hearing, the court awarded Kannaday damages of $6,969,314.30.

17

85. On April 23, 2009, Hasty unilaterally filed an *ex parte* Motion to Modify Judgment, alleging the Court made a mathematical error. On April 28, 2009, without conducting a hearing or giving notice to Vix, the court entered a Journal Entry increasing judgment to $7,219,064.37.

86. Fleeson learned of the *ex parte* award only after the journal entry of judgment was file.

87. On May 12, 2009, Geico removed the garnishment to federal court.

88. On May 22, 2009, Hasty provided Ball with a "Waiver of Attorney-Client Privilege," which Ball signed for use in the garnishment proceeding. Hasty provided the document directly to Ball without the knowledge or consent of Vix, attorney for the Hoyt Estate.

89. Despite serving as the Administrator of the Hoyt Estate for almost three years, Ball never submitted an invoice or bill to Hasty or Kannaday for his services.

90. On June 9, 2010, Judge Lungstrum issued a Memorandum and Order denying all Motions for Summary Judgment. *Kannaday v. Ball*, No. 09-02255-JWL, 2010 WL 2346368 (D.Kan. 2010). The court denied Geico's motion, finding that it has not "shown that the non-claim defense is so strong in this case as to be considered a sure winner."

91. On June 18, 2010, the Kansas Court of Appeals determined that the Settlement Agreement underlying the $7 million award was void for lack of consideration. *Kannaday v. Ball*, 44 Kan.App.2d 65 , 234 P.3d 826 (2010), *rev. denied*, March 7, 2011. The court held that a claimant who fails to assert a timely claim under K.S.A. 59-2239(1) cannot look to the

assets of the decedent's estate to satisfy any resulting judgment. As a result, Kannaday's forbearance from prosecuting an unenforceable claim against the estate assets was no consideration at all. The court found that the *ex parte* judgment was invalid, and remanded the case for a new trial on damages.

92. The court further found that the non-claim statute itself did not bar the plaintiff's bad faith claim against Geico. However, it also concluded that the insurance policy was not a true asset of the estate subject to Ball's direction or control. Rather, the policy created a potential fund for the protection of any true assets of the estate, and was instead "'at best, an inchoate asset of the estate *of no intrinsic value which would make it subject to administration or distribution.'" Id.*, at 831 (quoting *Schloegl v. Nardi*, 92 Ill.App.2d 302, 234 N.E.2d 558 (1968) (emphasis added).

93. Following the remand, the state court conducted a four-day trial on liability and damages. At the conclusion, the court granted judgment in favor of Kannaday and held Hoyt to be 100% liable for damages in the total amount of $4,723,368.60. The court also awarded court costs of $2,519.33.

94. On November 7, 2012, Kannaday filed a garnishment action against Geico in Wyandotte County District Court. Geico removed the action to this court.

95. On January 9, 2014, prior to the reassignment of this case to the undersigned, Judge Rogers issued a decision denying the parties' summary judgment motions.

96. An attorney may represent more than one client. Whether the lawyer has an actual conflict of interest under Kansas law is determined on the basis of a practical, real

world assessment rather than theoretical hypotheses.

97. A conflict of interest does not exist if the lawyers actions on behalf of one client do not affect the interests of the other.

98. No conflict of interest existed in Fleeson Gooing's representation of Geico and the Hoyt Estate. Because Hoyt was dead, her Estate had no assets, and the non-claim statute precluded any claim on such assets (even if they existed), the interests of the Estate were — in the practical and real world – identical to Geico's.

99. Fleeson Gooing owed a duty to act in the best interests of the Estate.

100. Ball, as *Special* Administrator under Kansas law, was essentially a name to be sued. If Ball gave directions contrary to the actual interests of the Estate – or, as here, essentially avoided cooperation or communication with Fleeson, the law firm owed a duty to act in interests of the Estate.

101. Fleeson Gooing's communications with Ball were reasonable and adequate in light of all the circumstances of the case, including the alignment of interests between the Estate and Geico, the limited nature of Ball's status as Special Administrator, and Ball's manifest unwillingness to cooperate and communicate.

102. Geico never refused to settle the injured passengers' claims. To the contrary, Geico's communications show a complete willingness, indeed a *desire*, to settle all claims for the "per accident" policy limits.

103. Given the circumstances of the case, there was no practical risk of future wage garnishment of the insured or future execution of assets on the Estate. Accordingly, Geico's

actions did not reflect any attempt at wagering on the insured's money.

104. Interpleader was a reasonable and appropriate method for meeting Geico's obligations, given the competing interests involved.

105. Under standard insurance industry practice, the November 4, 2005, $25,000 offer to Gold was reasonable, given that she was the only passenger then represented by counsel. In addition, although there is no affirmative obligation to do so, insurance companies may and frequently do consider the existence of other insurance in considering how to apportion claims. The availability of UIM coverage is an appropriate consideration in exceptional cases where, as here, the damages are far in excess of policy limits and the insurer actively seeks to fully pay out those limits.

106. At the time of Hasty's January 19, 2006 $25,000 settlement demand, Geico had already agreed to pay Gold $25,000. Accepting the Hasty demand, therefore, would have ensured that the third injured passenger, Wright, would receive nothing at all.

107. Although Geico could have ignored the "per accident" policy limits and directly paid each injured passenger $25,000, such an offer would be directly contrary to industry practice, as it would create an immediate precedent for disregarding policy language in other cases.

*Conclusions of Law*

1. Under the Geico policy, the insurer was obligated to provide liability coverage to a maximum of $25,000 per claimant, or $50,000 per accident. If a claim was advanced against Hoyt, Geico was obligated to defend her, and to pay damages (up to the policy maximum) which she became "legally obligated to pay because of bodily injury."

2. As the result of Hoyt's negligent operation of a motor vehicle, Genevie Gold, Sharon Wright and Rachel Kannaday were very seriously injured on July 13, 2005. Hoyt was killed in the accident.

3. Because the policy offered such limited coverage, and no estate for Hoyt had been created, Geico directly communicated with Hoyt's father, informing him that liability would likely exceed the limits of the policy.

4. Under Kansas law, a liability insurer who negligently or in bad faith refuses to settle a claim within policy limits may be held liable for amounts in excess of such limits. *Bollinger v. Nuss*, 202 Kan. 326,449 P.2d 502 (1969); *Dahlin v. State Farm Mut. Auto. Ins. Co.*, No. 02-2272-CM, 2003 WL 22594412 at * 6 (D. Kan. Sept. 26, 2003). Negligence exists when the insurer fails to use "that degree of care which would be used by an ordinarily prudent person in the management of his own business, with no policy limits applicable to the claim." *Bollinger*, 203 Kan. at 337-38. Bad faith exists if the insurer fails to "view the situation as it would be if there were no applicable policy limits." *Id.* "While negligence has been used by some courts to mean the same thing that other courts have designated as bad faith, it would appear that the two rules have tended to merge." *Id.*

22

5. Such liability primarily arises where the insurer "unreasonably refuses to settle with the injured party within policy limits." *Heinson v. Porter*, 244, Kan. 667, 675 (1989). "In the final analysis, the question of liability depends upon the circumstances of the particular case and must be determined by taking into account the various factors present, rather than on the basis of any general statement or definition." *Bollinger*, at 338. Thus, the court must examine

> (1) the strength of the injured claimant's case on the issues of liability and damages; (2) attempts by the insurer to induce the insured to contribute to a settlement; (3) failure of the insurer to properly investigate the circumstances so as to ascertain the evidence against the insured; (4) the insurer's rejection of advice of its own attorney or agent; (5) failure of the insurer to inform the insured of a compromise offer; (6) the amount of financial risk to which each party is exposed in the event of a refusal to settle; (7) the fault of the insured in inducing the insurer's rejection of the compromise offer by misleading it as to the facts; and (8) any other factors tending to establish or negate bad faith on the part of the insurer.

*Bollinger*, 202 Kan. at 338 (quoting *Brown v. Guarantee Insurance*, 155 Cal.App.2d 689, 319 P.2d 75 (1958)).

6. Geico never refused to obtain a settlement for less than the $50,000 "per accident" policy limit. The defendant actively sought to pay the full amount of the policy limit.

7. Geico acted timely. It initiated the first settlement discussions, and attempted to maintain communications with all of the injured passengers. It engaged in numerous attempts to communicate with Hoyt's father.

8. Geico promptly acknowledged that existence of liability and that the injuries to the passengers would exceed the policy limits. Geico informed Hoyt's father of the

existence of the excess claims, and repeatedly sought to alert the father to the nature of the claims involved. Geico also promptly investigated the accident.

9. Geico did not act contrary to the advice of counsel, but consistent with it. Fleeson Gooing advised the use of interpleader, which is a common practice in similar cases and which is a permissible approach under Kansas law. Further, Fleeson correctly advised that under the non-claim statute, no assets of the Estate were exposed to loss.

10. Geico actively sought to obtain a settlement of the claims arising from the accident, and promptly sought to pay out the entire $50,000 "per accident" policy limit. Its November 4, 2005, offer exhausted the policy limits,, and was made in good faith and without negligence.

11. Geico never directly refused Kannaday's counter-offer. The first demand of January 19, 2006, had no time limit. The second demand, made February 27, 2006, was withdrawn almost immediately, without justification, and without any fair opportunity for Geico to consider it.

12. Geico reasonably believed that the Estate's actual liability would not exceed policy limits because the policy was the only "asset" of the Estate. As a result, the amount of real world, practical risk to the Estate in the event of a failure to settle was negligible. The Estate was a shell, with zero assets, no prospect of assets, and, in any event, protected by a full and complete statutory defense to any attempt to execute on such assets.

13. Gold was the first passenger represented by counsel to advance a claim. At the time of Geico's November 4, 2005, offer, only Gold had made a claim on Geico. Geico

operated under the honest and not unreasonable mistake that Gold was the only passenger who lacked UIM coverage.

14. Geico's agent Roarick also mistakenly believed that such UIM coverage was legally available. However, Kansas is one of the few states which has formally adopted a "limits-to-limits" understanding of UIM coverage.

15. Geico had reasonably and appropriately advanced an offer of $25,000 to Gold. This settlement offer was not self-serving, but the opposite: a commendable (if mistaken) attempt to maximize the recovery available to the three passengers.[1] At the same time it offered the $25,000 settlement to Gold, Geico also extended offers to Kannaday and Wright.

16. Such a settlement offer was permissible under Kansas law, which recognizes that in the event of multiple claims, an insurer acting in good faith has the discretion to advance settlement offers to one claimant, "even though such settlements deplete or exhaust the policy limits of liability so that the remaining claimants have little or no recourse against the insurer." *Castorno v. Western Indemnity*, 213 Kan. 103, 111-12 (1973). *See also Bennett v. Conrady*, 180 Kan. 485, 487, 491-92 (1957).

17. Geico's offer to Gold left half the policy limits to split between Kannaday and Wright. In contrast, Kannaday's subsequent demand for $25,000 would have completely exhausted the policy limits and precluded any recovery at all for Wright.

18. Kannaday's demand came after the bar of the non-claim statute. The Hoyt estate

---

[1] The conclusion is also reflected in the fact that Geico actively encouraged Wright to apply for UIM benefits from her own UIM carrier — Geico.

was then free from claims to any of its assets. The only target for recovery available to Kannaday was the Geico policy.

19. While plaintiff now complains that Geico should have paid Gold only one third of the policy maximum, this is an argument grounded in hindsight rather than the contemporary circumstances of the case at the time of the negotiations. Moreover, there is no evidence that Kannaday herself, who, after all demanded, half the policy maximum, would indeed have agreed to a third.[2] The plaintiff's efforts at settlement were brief, perfunctory and pretextual.

20. The Hoyt Estate and Geico's interests, in a practical, real world sense, were effectively identical. The Hoyt Estate had no real existence other than as a placeholder for the Geico policy.

21. Ball as Special Administrator was not Fleeson Gooing's client. The client was the Estate of Hoyt. Ball simply served as a nominal client for the purpose of service of process. *See Hawthorne v. Beam*, 558 F.Supp. 694, 696-97 (E.D.Va. 1983).

22. Notwithstanding this distinction, Fleeson Gooing engaged in adequate and reasonable communications with Ball. Fleeson engaged in repeated efforts to communicate with Ball. Ultimately a complete breakdown in communications occurred, which was entirely the product of Ball's refusal to cooperate and communicate.

23. None of Geico's actions, whether denominated as negligence, bad faith, conflict

---

[2] Indeed, there is evidence on that, during the interpleader action, Wesley's counsel effectively offered Kannaday $19,000, or more than one third of the $50,000 "per accident" limit. Kannaday refused the offer.

of interest, or failure to properly communicate,[3] caused any real damage to the Hoyt Estate. Other than the Geico policy, any assets of the estate (there were none) were not subject to execution in light of the non-claim statute. Under all the evidence presented at trial, Judge Lungstrum's observation in 2010 remains true, the "plaintiff has utterly failed to show causation as a matter of law with respect to those claims [bad faith and negligence in defending the estate]." *Kannaday v. Ball*, No. 09-2255-JWL, 2010 WL 2346368 at * 7 (D. Kan. June 9, 2010).

24. Applied collectively, the court finds that the *Bollinger* factors do not support plaintiff's claims of negligence or bad faith.

25. The plaintiff relies on the mere existence of a claim in excess of policy limits — even if all assets of the insured are otherwise free from attack — as triggering an automatic conflict of interest. The court finds no actual conflict of interest or violation of the duty of communications by Geico or Fleeson Gooing which would entitle the plaintiff to recover. The actual circumstances of the case warrant the determination that Geico is not liable to the Estate, or the plaintiff, for the violation of any duty.

26. The plaintiff's argument that Geico and Fleeson had an automatic conflict fails to recognize that under the circumstances of the case, no effective claim could be advanced

---

[3] In the Pretrial Order (Dkt. 64), the plaintiff presents nearly three dozen specific complaints about the conduct by Geico. All fall within the general complaints that Geico acted in bad faith or negligent in failing to obtain a settlement, that it caused a conflict of interest by hiring Fleeson, and that it failed to properly communicate with Ball. The court finds that none of the specific complaints justify recovery under the facts of the case, for the reasons outlined elsewhere in this opinion.

against the insured's assets. As previously noted, the only "asset" of the Estate was the Geico policy. The Hoyt Estate otherwise had nothing, and that even that nothing was further protected by statutory immunity. An insurer must act "as though it alone would be responsible for the payment of any judgment rendered on the claim." *Rector v. Husted*, 214 Kan. 230, 239, 519 P.2d at 641 (1974). Once the non-claim statute took effect on January 14, 2006, Geico indeed was "alone ... responsible for the payment of any judgment." There could be no conflict of interest where the "interests" involved were, in every meaningful sense, identical. Because of this identity of real-world interests, Geico and Fleeson had no conflict with the Estate.

27. For example, as one of her allegations of conflict, the plaintiff complains of Geico's alleged breach of duty in attacking the lack of consideration for the first *ex parte* state court judgment, which was premised on the Hasty-Ball Settlement Agreement. However, as set forth earlier, the responsibility for the breakdown in communications rests with Ball, who clearly indicated he was not interested in anything Fleeson had to say. Fleeson sent dozens of communications to Ball, who essentially ignored the law firm. Further, as noted elsewhere, Ball was not Fleeson's client, which was the Estate. Finally, plaintiff has demonstrated no injury to the Estate from any of supposed conflicts. Indeed, Fleeson's successful appeal directly benefitted the estate by reducing the overall judgment by some $2.5 million.

28. Similarly, the court finds no merit to plaintiff's complaint that Geico failed keep Ball informed of the status of the claims against the Estate. Under the circumstances of the

case, Geico and Fleeson satisfied their obligation to keep the Estate informed.

29. Geico had no need to simply repeat Fleeson's communications. It could and did reasonably reasonably rely on its agent, Fleeson, to represent the Estate.

30. Fleeson adequately communicated with Ball under all the circumstances of the case.

31. The Estate faced no monetary risk by the operation of the non-claim statute. Geico paid its entire policy limits (half to Gold and half in the interpleader action). The insurer thus had no interest which it was attempting to preserve at the expense of the Estate. While Fleeson represented both Geico and the Estate, their interests did not materially conflict.

32. The court notes that Geico reserves the argument that that Judge Rogers erred in extending the Kansas "judgment rule" to the present action. Under that rule, an insurer has a duty try and obtain a reasonable settlement, even where its insured is insolvent. The Kansas Supreme Court concluded in *Farmers Ins. Exchange v. Schropp*, 222 Kan. 612, 567 P.2d 1359, 1369 (1977):

> We do not think that the prepayment rule serves the ends of justice, and decline to adopt it. On the contrary, we see no reason why the insolvency of an insured or his estate should excuse the insurer from exercising the same good faith it would be expected to exercise, were the insured fully financially responsible. Further, an insured need not wait until his property is seized under an excess judgment before commencing action against an insurer whom the insured claims has acted negligently or in bad faith in failing to settle a claim within the policy limits. The action lies, whether or not the insured has paid or can pay an excess judgment.

In the present action, however, after January, 2006 there was no danger at all that the Hoyt

Estate's "property [might be] seized under an excess judgment," since it had no property. Further, even if Hoyt had any property, the insured was no longer alive and was completely protected by statute – any judgment could only collected against the Geico policy. Finally, under its policy, Geico is legally obligated to pay only those "damages for which [the Hoyt Estate] becomes *legally obligated to pay*." (Emphasis added). After January 14, 2006, the non-claim statute established that the Hoyt estate could not become "legally obligated to pay" any judgment. Thus, the Estate of Hoyt itself could not bring an action against Geico, and Geico accordingly argues that extending the judgment rule to deceased, insolvent insureds who are also protected from the effects of any judgment by operation of statute (here, the non-claim statute) creates the bizarre result that a creditor of the insured may recover damages which the insured never really suffered.

The court finds it is unnecessary to resolve the issue, and accepts the summary judgment ruling as the law of the case. The court assumes that Geico had a duty to act in good faith towards the interests of the Hoyt Estate. However, even if the judgment rule is applicable, and thereby creates an action for negligence and bad faith by plaintiff against Geico, the court finds that Geico is not liable under any of the theories advanced in this case. As a matter of law and fact, that Geico met this duty under all the circumstances of the case.

33. Accordingly, the insolvency of the Hoyt Estate is not a bar to the present action. It remains, however a key element in the circumstances of the case. As Judge Lungstrum observed, the lack of assets of an insured, while not itself a bar to an action for bad faith

against an insurer, still *may* be relevant to other issues, however." 2010 WL 2346368, at *9 (emphasis in original).

> For instance, in *Associated Wholesale Grocers, Inc. v. Americold Corp.*, 261 Kan. 806, 934 P.2d 65 (1997), the court held that the insured's solvency was relevant to the determination of whether a settlement executed by the insured was reasonable, as an insolvent insured would have less incentive to act reasonably, and the insolvency could show that the settlement was not entered into at arm's length. See id. at 839, 934 P.2d at 86. In *McNally v. Nationwide Ins. Co.*, 815 F.2d 254 (3d Cir.1987), a case cited by plaintiff here, the Third Circuit confirmed this distinction, noting that although, as shown by various cases, an insurer cannot argue that an insolvent insured suffers no harm (as he still suffers harm from the judgment itself), the insurer need not ignore the lack of assets in trying to figure out how claimants will act regarding settlement offers. *See id.* at 263.

*Id.* Here, the Hoyt Estate's complete lack of assets (and indeed statutory protection from any attempted execution based on a judgment) is relevant to understanding the relative position of the parties, and the context under which the parties operated. It is also relevant to show the context of the negotiations of the parties, and lends support to the ultimate conclusion of the court — settlement was not possible because the plaintiff was never truly interested in settlement. The plaintiff was interested in the creation of a bad faith claim against the insurer.

34. Thus, as a theoretical matter the Kansas "judgment rule" recognizes that a judgment against an insured may provide the foundation for a bad faith action against the insurer. However, the court cannot ignore the fact that, as a practical matter and under the real-world circumstances of this case, such a judgment would never occur, except as an attempt to artificially construct a bad faith claim.

35. Kansas law in this area is designed to encourage settlements and promote fairness by equalizing the positions of claimants and insurers. *Glenn v. Fleming*, 247 Kan. 296, 319, 799 P.2d 79, 93 (1990) (quoting *Critz v. Farmers Ins. Group*, 41 Cal.Rptr. 401, 408 (Cal.App. 1964)). This policy is not advanced by encouraging claimants to try to create bad faith claims, even where the evidence clearly demonstrates that the insurer never sought to pay less than its full policy limits. The Tenth Circuit's observation in is applicable here:

> [T]he doctrinal impetus for insurance bad faith claims derives from the idea that the insured must be treated fairly and his legitimate interests protected.... In other words, the justification for bad faith jurisprudence is as a shield for insureds—not as a sword for claimants. Courts should not permit bad faith in the insurance milieu to become a game of cat-and-mouse between claimants and insurer, letting claimants induce damages that they then seek to recover, whilst relegating the insured to the sidelines as if only a mildly curious spectator.

*Wade v. EMCASCO Insurance*, 483 F.3d 657, 669-70 (10th Cir. 2007) (quoting *Peckham v. Continental Casualty Insurance*, 895 F.2d 830, 835 (1st Cir. 1990)).

36. Under the facts of this case, the Estate had no reason to fear any attempt to obtain judgment – except as a part of the game recognized in *Wade v. EMCASCO*. There was utterly no *motive* for any claimant to seek such a worthless, pointless judgment, other than as a pretext for a bad faith claim.

37. Geico certainly was not error-free in its handling of the claims arising from the accident. But in each instance, the court finds that such errors are relatively minor and largely identifiable through hindsight. None bore the slightest hint of bad faith or a lack of due care, and in no event did the errors, individually or collectively, have any real or

tangible impact on the insured. Geico is not liable for such mere errors of judgment.

38. Geico never sought to deny liability. It never sought to pay anything less than the full "per accident" policy limits.

39. Geico acted honestly, and dealt with the numerous actual or potential claimants in a timely fashion.  The fundamental error underlying Geico's handling of the claim was caused by the relatively unusual, "limits-to-limits" nature of Kansas law, an honest factual misunderstanding as to the UIM coverage available to the injured passengers, and, ironically, a desire to *maximize* the funds actually given the passengers.

40. In sum, the court finds that Geico acted in good faith, reasonably, without negligence in its investigation, communications, negotiations, and settlement efforts. Neither Geico nor Fleeson harmed the Estate by any breach of duty. Geico attempted to communicate with all the parties injured in the accident, and there is no evidence that all three injured passengers were willing to jointly settle their claims.

41. In addition, the court finds for Geico on its affirmative defense based on the failure to cooperate of the Special Administrator for the Ball Estate. Just as the insurer has an obligation to act in good faith and without negligence, the insurer has a duty to cooperate with the insurer. The insurer is relieved of responsibility where the insured violates the duty to cooperate, and this results in substantial prejudice to the insurer. *Boone v. Lowery*, 8 Kan.App.2d 293, at 299, 657 P.2d 64, 70 (1983) (to show substantial prejudice, the insurer has to burden to show "that if the cooperation clause had not been breached there was a substantial likelihood that the trier of fact, in an action against the insured,

would have found in the insured's favor"). *See also Bollinger v. Nuss*, 202 Kan. at 332 (recognizing that insurer and insured have "a mutual fiduciary relationship").

42. Ball failed to cooperate with the Fleeson firm's attempt to defend the Estate, and independently sought to settle the action with Kannaday, leading to the *ex parte* first judgment, obtained without notice to Fleeson or Geico. He also entered into an agreement unilaterally under which he waived attorney-client privileges. Such unfair settlements, which generated no actual benefit to the Estate, reflect a breach of the insured's fiduciary obligation to the insurer. *See Sargent v. Johnson*, 551 F.2d 221, 231-32 (8th Cir. 1977); *Roach v. Estate of Ravenstein*, 326 F.Supp. 830, 839 (S.D. Iowa).

42. In the present action, Geico has shown not only a "substantial likelihood" of a different result, the evidence demonstrates an *actual* difference in result. The *ex parte* judgment "utterly" lacked consideration, and the final award was substantially reduced following the remand. Although Geico ultimately prevailed in vacating the *ex parte* judgment based on the lack of consideration, it incurred large attorney fee costs in having to appeal.

43. At the time Ball executed the Settlement Agreement, the assets of the Estate were protected by operation of the Kansas non-claim statute. Indeed, Judge Lampson had ruled in the state action that the "assets of the estate cannot be applied to satisfy any judgment rendered." Ball's failure to communicate was unjustified, and his concession to the Settlement Agreement was unnecessary. Ball has rationalized the agreement as necessary to protect any "after-acquired assets" gained by the Estate. As noted above, there is not a

shred of evidence that the Hoyt Estate had any prospect of obtaining assets in the future. More importantly, the plaintiff has presented no support or credible evidence for the notion that the non-claim statute is inapplicable to subsequently acquired assets.

IT IS ACCORDINGLY ORDERED this 29th day of August, 2014, that the court finds for the defendant Geico on all claims herein, and that the plaintiff take nothing by way of judgment.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE